# In the United States Court of Federal Claims

No. 23-64C

(Filed:  April 5, 2023)

|  |  |
|---|---|
| **DEFENSE INTEGRATED SOLUTIONS, LLC,** | ) ) ) |
| *Plaintiff,* | ) ) ) |
| **v.** | ) ) ) |
| **THE UNITED STATES,** | ) ) ) |
| *Defendant,* | ) ) ) |
| **and** | ) ) ) |
| **STRATEGIC ALLIANCE SOLUTIONS LLC,** | ) ) ) ) |
| *Defendant-Intervenor.* | ) ) ) ) |

*Matthew T. Schoonover*, Schoonover & Moriarty LLC, Olathe, KS, for Plaintiff.  With him on the briefs were *John M. Mattox II* and *Timothy J. Laughlin*.  Of counsel were *Emily J. Chancey*, *Joshua B. Duvall*, and *Nicholas P. Greer*, Maynard Cooper & Gale, P.C., Hunstville, AL.

*Bryan M. Byrd*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.  With him on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *William J. Grimaldi*, Assistant Director.

*Meghan F. Leemon*, PilieroMazza, PLLC, Washington, D.C., for Defendant-Intervenor.  Of counsel were *Jonathan T. Williams*, *Katherine B. Burrows*, *Peter B. Ford*, and *Eric A. Valle*.

<u>**OPINION AND ORDER**</u>

*SOLOMSON*, **Judge.**

This case involves the litigation version of Freaky Friday — all of the parties have essentially switched positions, in one way or another, from the last time they were before this Court. The Small Business Administration ("SBA") Office of Hearing and Appeals ("OHA") previously concluded that Strategic Alliance Solutions LLC ("SAS") — a joint venture competing for a service-disabled veteran-owned small business ("SDVOSB") set-aside procurement — was ineligible for contract award because SAS's joint venture agreement did not comply with a relatively new SBA regulation, 13 C.F.R. § 125.18(b)(2)(ii)(A). SAS challenged that SBA OHA decision before this Court, and the parties — including both the government and the then-Defendant-Intervenor, Defense Integrated Solutions, LLC ("DIS") — agreed to the terms of a remand order for SBA OHA to reconsider its decision. SBA OHA reversed itself. Unhappy with that result, DIS is now the Plaintiff challenging SBA OHA's new decision on the grounds that the agency got it right the first time, while SAS has intervened to defend, rather than challenge, OHA's new decision.

Having considered the parties' arguments, this Court concludes that: (1) the plain language of 13 C.F.R. § 125.18(b)(2)(ii)(A) supports SBA OHA's revised interpretation; or, in the alternative, (2) given the parties' agreement that the regulation is ambiguous, SBA OHA's interpretation of § 125.18(b)(2)(ii)(A) is entitled to deference. Either way, the government and SAS are entitled to judgment on the administrative record.

## I.    REGULATORY BACKGROUND

As early as 1974, Congress instructed the SBA to give "special consideration to veterans of the Armed Forces of the United States and their survivors or dependents." Act of Jan. 2, 1974, Pub. L. No. 93-237, § 8, 87 Stat. 1023, 1025 (amending 15 U.S.C. § 633); *see also* R. Corrine Blackford, Cong. Rsch. Serv., R47226, *Federal Contracting by Veteran-Owned Small Businesses: An Overview and Analysis of Contemporary Issues* 7 (2022) (describing SBA legislative and regulatory history). Since then, the SBA "has led federal efforts to support" veteran-owned small businesses ("VOSBs") and "veterans who want to become business owners." Blackford, *supra* at 16; *see also id.* at 8–10 (describing SBA's SDVOSB program); *id.* at 13–15 (describing SBA programs to support VOSBs).

From around the turn of the millennium onward, Congress repeatedly has exercised its legislative prerogative over federal procurements to further assist VOSBs. For example, the Veterans Entrepreneurship and Small Business Development Act of 1999 aimed to "expand existing and establish new assistance programs for veterans who own and operate small businesses." Pub. L. No. 106-50, § 102, 113 Stat. 233, 234 (1999). This included setting a government-wide goal that SDVOSBs participate in at least three

percent "of the total value of all prime contract and subcontract awards for each fiscal year." *Id.* § 502(a)(2), 113 Stat. at 247 (codified as amended at 15 U.S.C. § 644(g)(1)(A)(ii)); *see also* Federal Acquisition Regulation: Veterans Entrepreneurship and Small Business Development Act of 1999, 67 Fed. Reg. 56,122, 56,123 (Aug. 30, 2002) (finalizing FAR revisions published earlier, 65 Fed. Reg. 60,542 (Oct. 11, 2000), to implement parts of the Act related to SDVOSBs).

In 2003, Congress created the SDVOSB Procurement Program to assist small business concerns ("SBCs") owned and controlled by service-disabled veterans. *See* Veterans Benefit Act of 2003, Pub. L. No. 108-183, § 308, 117 Stat. 2651, 2662 (2003) (codified as amended at 15 U.S.C. § 657f); *see also* Federal Acquisition Regulation: Procurement Program for Service-Disabled Veteran-Owned Small Business Concerns, 70 Fed. Reg. 14,950 (Mar. 23, 2005) (finalizing proposed FAR revisions, 69 Fed. Reg. 25,273 (May 5, 2004), to create FAR subpart 19.14); FAR 19.1401(a). And, pursuant to the Veterans Benefits, Health Care, and Information Technology Act of 2006, Pub. L. No. 109-461, 120 Stat. 3431–36 (codified as amended at 38 U.S.C. §§ 8127–28), Congress required the Secretary of the Department of Veterans Affairs ("VA") to set annual goals for contracting with SDVOSBs and other VOSBs. *See* 38 U.S.C. § 8127(a); VA Acquisition Regulation: Supporting Veteran-Owned and Service-Disabled Veteran-Owned Small Businesses, 74 Fed. Reg. 64,619, 64,631 (Dec. 8, 2009).

The federal government generally continues to aim to award at least 3% of all federal contracting dollars to SDVOSBs each year.[1] Although no government-wide procurement goal for VOSBs exists, the VA maintains a program limited to its agency known as the Veterans First program. *See* VA Acquisition Regulation ("VAAR") 819.7001(a)–(b) (codified at 48 C.F.R. ch. 8);[2] Blackford, *supra* at 12 ("The VA's FY2023 VOSB goal is 17%. In recent years, the VA has awarded a higher percentage to VOSBs than the goal."). The Veterans First program requires VA contracting officers ("COs") to set aside contracts for SDVOSBs and VOSBs where the Rule of Two is met — that is, where the cognizant CO reasonably expects that at least two such businesses will submit offers and that "the award can be made at a fair and reasonable price that offers best value to the United States." 38 U.S.C. § 8127(d)(1); *see also* FAR 19.1405(b) (setting out these two conditions); 13 C.F.R. § 128.404 (Veteran Small Business Certification Program set-asides for VOSBs and SDVOSBs); VAAR 819.7006(a) (Veterans First set-asides); VA Acquisition Regulation: Plain Language Rewrite, 73 Fed. Reg. 2711, 2750 (Jan. 15, 2008) (finalizing 819.7001); 74 Fed. Reg. at 64,633–34 (Dec. 8, 2009) (finalizing additional VAAR sections); *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 164–65 (2016) (defining the Rule of

---

[1] *See* 15 U.S.C. § 644(g)(1)(A)(ii); *Veteran Contracting Assistance Programs*, U.S. Small Bus. Admin., https://www.sba.gov/federal-contracting/contracting-assistance-programs/veteran-contracting-assistance-programs (last visited Mar. 22, 2023).

[2] The VAAR is the VA's supplement to the Federal Acquisition Regulation ("FAR").

Two and holding that, pursuant to 38 U.S.C. § 8127(d), "the [VA] must use the Rule of Two when awarding contracts"); *AmBuild Co., LLC v. United States*, 119 Fed. Cl. 10, 19 (2014) (explaining that "the Veterans First Contracting Program . . . was established in 2007, under which VA considers SDVOSB and VOSB entities as first and second priority for procurement awards").[3]

The COs of other federal executive branch agencies may also set aside procurements for SDVOSBs where the Rule of Two is met. *See* 15 U.S.C. § 657f(d) ("Restricted competition") ("In accordance with this section, a contracting officer may award contracts on the basis of competition restricted to small business concerns owned and controlled by service-disabled veterans . . . if the contracting officer has a reasonable expectation that not less than 2 small business concerns owned and controlled by service-disabled veterans will submit offers and that the award can be made at a fair market price."); FAR 19.203(c) (governing "acquisitions of supplies or services that have an anticipated dollar value exceeding the simplified acquisition threshold"); *see also Small Business Programs*, Def. Logistics Agency, https://www.dla.mil/Small-Business/Getting -Started/Programs/ (last visited Mar. 22, 2023) (providing guidance about DLA VOSB and SDVOSB set-asides). COs may award contracts to SDVOSBs via either set-aside procedures, FAR 19.1405(a)(2), or sole-source awards, FAR 19.1406(a). *See* FAR 19.1405(a)(3) (requiring COs to "consider SDVOSB set-asides before considering SDVOSB sole source awards" (citations omitted)); FAR 19.1406(a) (requiring COs to consider SDVOSB sole source awards before considering a set-aside for small businesses in general).[4]

An offeror for an SDVOSB procurement must qualify as "(1) [an] [SDVOSB] concern; and (2) [a] [s]mall business concern under the North American Industry Classification System (NAICS) code assigned to the procurement." FAR 19.1403(b); *see also* FAR 19.1403(a) (providing that "[s]tatus as a[n] [SDVOSB] concern is determined in accordance with [13 C.F.R. § 128.200]"). According to 13 C.F.R. § 128.200, "[a] concern must be certified as a VOSB or SDVOSB pursuant to [13 C.F.R.] § 128.300 in order to be

---

[3] 13 C.F.R. § 128.400(a) ("What are VOSB and SDVOSB contracts?") ("VOSB contracts are exclusively VA procurements, including prime contracts and subcontracts for which the VA is the procuring agency.").

[4] *See* 13 C.F.R. § 128.100 ("Section 8127 of Title 38 within the U.S. Code (38 U.S.C. 8127) authorizes certain procurement mechanisms to provide [VOSBs] and [SDVOSBs] with contracting assistance opportunities at the [VA]. Section 36 of the Small Business Act (15 U.S.C. 657f) authorizes certain procurement mechanisms to provide SDVOSBs with contracting assistance opportunities across the Federal Government. In addition, sections 36 and 36A of the Small Business Act (15 U.S.C. 657f, 657f-1) authorize the [SBA] to certify the status of VOSB and SDVOSBs. This part implements these mechanisms and ensures that the program created, referred to as the Veteran Small Business Certification Program, is substantially related to this important congressional goal in accordance with applicable law.").

awarded a VOSB or SDVOSB set-aside or sole source contract."  13 C.F.R. § 200(c)(1); *see* 13 C.F.R. § 128.300 (requiring a business concern to "submit evidence" for SBA certification); 13 C.F.R. § 128.303 ("What must a concern submit to apply for VOSB or SDVOSB certification?"); 13 C.F.R. § 128.306 ("How does a concern maintain its VOSB or SDVOSB certification?").  To receive SBA certification, "a concern must . . . demonstrat[e] that it is owned and controlled by one or more qualifying veterans and qualifies as a small business concern."  13 C.F.R. § 128.303(a).

Ordinarily, if a concern or entity cannot qualify as a small business, then its affiliates also cannot qualify as small businesses.  *See* 13 C.F.R. § 121.103(a)(1) ("Concerns and entities are affiliates of each other when one controls or has the power to control the other, or a third party or parties controls or has the power to control both."); *id.* § 121.103(a)(6) ("In determining the concern's size, SBA counts the receipts, employees, or other measure of size of the concern whose size is at issue and all of its domestic and foreign affiliates[.]").  Normally, then, a small business and an ineligible large business cannot partner together for set-aside procurements via a joint venture.  *See* 13 C.F.R. § 121.103(h)(1)(i); *Juliet Constr., LLC v. United States*, 2019 WL 1400178, at *2 (Fed. Cl. Mar. 19, 2019) ("If a mentor and protégé are found to be affiliated, the protégé may be considered 'other-than-small' and therefore ineligible for certain federal contracts." (citing 13 C.F.R. §§ 121.101–.103, 125.8–.9)).  Similarly, a company cannot meet the VOSB or SDVOSB set-aside requirements if that company is affiliated with an ineligible entity (*i.e.*, a large business).  *See* 13 C.F.R. § 128.402(a)–(b).

There are exceptions to the general affiliation rules.  A joint venture may qualify for an SDVOSB procurement provided, amongst other things, that "[a]t least one party to the joint venture is a[n] [SDVOSB] concern."  FAR 19.1403(c)(2).[5]  The other party to a joint venture may even be a large business if the joint venture participates in the SBA's mentor-protégé program, often referred to as the "MPP."  *Field Training Support Servs. v. United States*, 2016 WL 7212326, at *1 (Fed. Cl. Dec. 13, 2016) (discussing "an exemption

---

[5] *See also* 13 C.F.R. § 121.103(h)(1)(i) ("A joint venture of two or more business concerns may submit an offer as a small business for a Federal procurement, subcontract or sale so long as each concern is small[.]"); *id.* § 125.18 (2022) (revised and recodified at 13 C.F.R. § 128.402(a)); *id.* § 128.402(a) ("A certified VOSB or SDVOSB may enter into a joint venture agreement with one or more other small business concerns [regardless of veteran status] . . . for the purpose of submitting an offer for a VOSB or SDVOSB contract.") (effective January 1, 2023); *id.* § 125.18(b)(1)(i) (2022) (revised and recodified at 13 C.F.R. § 128.402(b)(1)); *id.* § 128.402(b)(1) ("A joint venture of at least one certified VOSB or SDVOSB . . . may submit an offer . . . so long as each concern is small[.]") (effective January 1, 2023); *see* FAR 52.219-27(d) (requiring SDVOSB set-aside solicitations and contracts to include language describing how joint ventures can qualify as an SDVOSB concern).  Unless otherwise noted, all references to 13 C.F.R. § 125.18 are to the 2022 version that SBA OHA applied in this case.

from the affiliation rules available to certain joint-ventures involving one small and one large business which have an approved 'mentor/protégé' relationship").[6]

As of November 16, 2020, the SBA manages a single "All Small Mentor-Protégé program." 13 C.F.R. § 125.9 ("What are the rules governing SBA's small business mentor-protégé program?").[7] The purpose of the All Small MPP is "to enhance the capabilities of protégé firms by requiring approved mentors to provide business development assistance to protégé firms and to improve the protégé firms' ability to successfully compete for federal contracts." 13 C.F.R. § 125.9(a). The assistance a mentor provides to a protégé "may include technical and/or management assistance" as well as "assistance in performing prime contracts with the Government through joint venture arrangements" (amongst other forms of assistance). *Id.*; *see also* 85 Fed. Reg. at 66,147 (describing the purpose of and assistance through the mentor-protégé program in similar terms). In that regard, "[m]entors are encouraged to provide assistance *relating to the*

---

[6] *See* 15 U.S.C. § 657r(a) (authorizing an SBA "mentor-protege program for all small business concerns"); 13 C.F.R. § 121.103(h)(1)(ii) ("Two firms approved by SBA to be a mentor and protégé under § 125.9 of this chapter may joint venture as a small business for any Federal government prime contract or subcontract, provided the protégé qualifies as small . . . and the joint venture meets the requirements of [regulation sections including] . . . [13 C.F.R. § 128.402(c) and (d)[.]"); *id.* § 125.18(b) (2022) (revised and recodified at 13 C.F.R. § 128.402(a)); *id.* § 128.402(a) ("A certified VOSB or SDVOSB may enter into a joint venture agreement . . . with an approved mentor authorized by § 125.9 of this chapter, for the purpose of submitting an offer for a VOSB or SDVOSB contract.") (effective January 1, 2023); *id.* § 125.18(b)(1)(ii) (2022) (revised and recodified at 13 C.F.R. § 128.402(b)(2)); *id.* § 128.402(b)(2) ("A joint venture between a protégé firm certified as a VOSB or SDVOSB and its SBA-approved mentor . . . will be deemed small provided the protégé qualifies as small[.]") (effective January 1, 2023); *SBA Mentor-Protégé Program*, Small Bus. Admin., https://www.sba.gov/federal-contracting/contracting-assistance-programs/sba-mentor-protege-program (last visited Mar. 22, 2023); *Joint Ventures*, Small Bus. Admin., https://www.sba.gov/federal-contracting/contracting-assistance-programs/joint-ventures (last visited Mar. 22, 2023).

[7] *See also* 15 U.S.C. § 657r(a) (authorizing the All Small MPP); *id.* § 657r(b)(3) (mandating regulations about mentor-protégé programs that "improve the ability of proteges to compete for Federal prime contracts and subcontracts"); 13 C.F.R. § 121.103(h)(i) (identifying an affiliation exception in that "[t]wo firms approved by SBA to be a mentor and protégé *under § 125.9 of this chapter* may joint venture" (emphasis added)); Consolidation of Mentor-Protégé Programs and Other Government Contracting Amendments, 85 Fed. Reg. 66,146, 66,146 (Oct. 16, 2020) (explaining that "this [final] rule merges the 8(a) Business Development (BD) Mentor-Protégé Program and the All Small Mentor-Protégé Program to eliminate confusion and remove unnecessary duplication of functions within SBA"); *id.* at 66,147 ("SBA published a Final Rule in the Federal Register combining the authorities contained in [two statutes] . . . to create a mentor-protégé program for all small businesses." (citing Small Business Mentor Protégé Programs, 81 Fed. Reg. 48,558, 48,558 (July 25, 2016)).

*performance of contracts set aside or reserved for small business* so that protégé firms may more fully develop their capabilities." 13 C.F.R. § 125.9(a) (emphasis added).

As noted above, one of the benefits of participating in the MPP is that "[a] protégé and mentor may joint venture as a small business for any government prime contract, subcontract or sale, provided the protégé qualifies as small for the procurement or sale." 13 C.F.R. § 125.9(d)(1); *see also* 13 C.F.R. § 121.103(h)(1)(ii) (identifying exceptions to affiliation); *Straughan Env't, Inc. v. United States*, 135 Fed. Cl. 360, 364 (2017) ("The SBA has recognized an exception to this general rule regarding joint ventures, however, for what are known as 'mentor and protégé' joint ventures. Under the SBA's mentor and protégé rules, the size determination is based only on the size of the small business or protégé." (citing 13 C.F.R. § 121.103(h)(3) (2017))); *IEI-Cityside JV v. United States*, 122 Fed. Cl. 750, 752 (2015) (summarizing the joint venture exception in 13 C.F.R. § 121.103).[8]

For a joint venture to qualify for MPP benefits — and "for the joint venture to receive the exclusion from affiliation" — the "SBA must approve the mentor-protégé agreement." 13 C.F.R. § 125.9(d)(1)(i).[9] In addition, the joint venture agreement must meet the requirements specified in 13 C.F.R. § 125.8(b)(2) ("Contents of joint venture agreement"). 13 C.F.R. § 125.9(d)(1)(ii). Once a mentor-protégé agreement is approved, a compliant joint venture "may seek any type of small business contract . . . for which the

---

[8] *See also Joint Ventures*, *supra* note 6; *Computer World Servs. Corp.*, B-419956.18, 2021 CPD ¶ 368, 2021 WL 5531177, *4 (Comp. Gen. Nov. 23, 2021) ("One benefit of the mentor-protégé program is that a protégé and mentor may form a joint venture. If SBA approves a mentor-protégé joint venture, the joint venture is permitted to compete as a small business for 'any government prime contract[,] . . . subcontract or sale, provided the protégé qualifies as small for the procurement.'" (citations omitted) (citing and quoting 13 C.F.R. § 125.9(d))); *Int'l Glob. Sol., LLC*, B-419956.20, 2021 CPD ¶ 363, 2021 WL 5449150, *4 n.4 (Comp. Gen. Nov. 18, 2021) ("The mentor-protégé program allows a large business mentor firm and a small business protégé firm to form a joint venture that may compete as a small business for a prime contract or subcontract, provided the protégé individually qualifies as small for the procurement." (citing 13 C.F.R. §§ 125.9(d)(1), 121.103(b)(6), (h)(1)(ii))).

[9] *See also* 13 C.F.R. § 121.103(h)(1)(ii) (excepting joint ventures between "[t]wo firms *approved by SBA to be a mentor and protégé* under § 125.9 of this chapter" from usual affiliation standards (emphasis added)); *id.* § 128.402(b)(2) (effective January 1, 2023) ("A joint venture between a protégé firm certified as a VOSB or SDVOSB and its *SBA-approved* mentor (see § 125.9 of this chapter) will be deemed small" (emphasis added)); *id.* § 125.18 (2022) (revised and recodified at 13 C.F.R. § 128.402(b)) (also describing joint ventures involving an "SBA-approved mentor"); FAR 19.301-1(a)(2)(i)(B) (allowing SBCs to qualify as such if "[t]he protégé is small . . . in a joint venture comprised of a mentor and protégé with an approved mentor-protégé agreement under an SBA mentor-protégé program"); 13 C.F.R. § 125.9(d)(4) ("No determination of affiliation or control may be found between a protégé firm and its mentor based solely on the mentor-protégé agreement or any assistance provided pursuant to the agreement. However, affiliation may be found for other reasons set forth in § 121.103 of this chapter.").

protégé firm qualifies," including a procurement set-aside for SDVOSBs.   13 C.F.R. § 125.9(d)(1).[10]

At least as of August 24, 2016, compliant joint venture agreements between a mentor and SDVOSB protégé had to contain provisions that, amongst other things: (1) "[d]esignat[e] an SDVO SBC as the managing venturer of the joint venture, and an employee of the SDVO SBC managing venturer as the project manager responsible for the performance of the contract"; (2) "[s]pecify[] the responsibilities of the parties with regard to negotiation of the contract, source of labor, and contract performance"; and (3) "[o]bligat[e] all parties to the joint venture to ensure performance of the of the SDVO contract and to complete performance despite the withdrawal of any member."  81 Fed. Reg. at 48,590 (amending 13 C.F.R. § 125.18(b)(2) ("Contents of joint venture agreement")).[11]   The regulation further provided that "[t]he work performed by the [SDVOSB] partner(s) must be more than administrative or ministerial functions so that they gain substantive experience."    81 Fed. Reg. at 48,590 (13 C.F.R. § 125.18(b)(3)(ii)(A)).[12]

On November 8, 2019, in response to President Trump's executive order calling for the reduction in unnecessary and burdensome regulations, the SBA proposed an extensive rewrite of many of its government contracting regulations.  *See* Consolidation of Mentor Protégé Programs and Other Government Contracting Amendments, 84 Fed. Reg. 60,846 (Nov. 8, 2019).  The primary change was the consolidation of SBA's decades-old 8(a) Business Development Mentor-Protégé Program with the more-recently created All Small MPP, which significantly expanded protégé eligibility in 2016.  84 Fed. Reg. 60,846–47 (discussing anticipated benefits of the consolidation and miscellaneous streamlining of 8(a) Business Development Program); *SBA Proposes to Merge 8(a) Business Development Mentor-Protégé Program and All Small Mentor-Protégé Program*, Small Bus. Admin. Off. of Advoc. (Nov. 25, 2019), https://advocacy.sba.gov/2019/11/25/sba-

---

[10] *See also* 13 C.F.R. § 128.402(a) (effective January 1, 2023) ("A certified VOSB or SDVOSB may enter into a joint venture agreement with . . . an approved mentor authorized by § 125.9 of this chapter, for the purpose of submitting an offer for a VOSB or SDVOSB contract."); *id.* § 125.18(b) (2022) (revised and recodified at 13 C.F.R. § 128.402(a)).

[11] This regulatory language dates back to 2004, when it was located at 13 C.F.R. § 125.15(b)(2).  *See* Small Business Size Regulations: Government Contracting Programs, 69 Fed. Reg. 25,262, 25,268 (May 5, 2004).

[12] Also effective August 24, 2016, SBA added a new 13 C.F.R. § 125.8 to describe requirements any joint venture must satisfy to submit an offer for small business set-asides.  81 Fed. Reg. at 48,585 (finalizing 13 C.F.R. § 125.8); *see id.* at 48,588 (adding 13 C.F.R. § 125.9(d)(1)(ii), which requires joint ventures to satisfy 13 C.F.R. § 125.8(b)(2)).  This version of 13 C.F.R. § 125.8 included requirements of joint venture agreements that were almost identical to the requirements in the contemporaneous version of 13 C.F.R. § 125.18.  *Compare id.* at 48,590 (13 C.F.R. § 125.18(b)(2)), *with id.* at 48,585 (13 C.F.R. § 125.8).

proposes-to-merge-8a-business-development-mentor-protege-program-and-all-small-mentor-protege-program/.[13]  SBA's goals also included: eliminating confusion regarding perceived differences between the two programs; removing unnecessary duplication of functions within SBA; and establishing one, unified staff to better coordinate and process mentor-protégé applications.  84 Fed. Reg. at 60,846–47 (explaining that "[i]n merging the 8(a) BD Mentor-Protégé Program with the All Small Mentor-Protégé Program, the proposed rule would also make conforming amendments to SBA's size regulations (13 CFR part 121), the joint venture provisions (13 CFR 125.8), and the All Small Mentor-Protégé Program regulations (13 CFR 125.9)"); *id.* at 60,868–71 (discussing proposed changes to 13 C.F.R. part 121); *id.* at 60,877–78 (same for 13 C.F.R. § 125.8); *id.* at 60,879 (proposing a revision to the SDVOSB-specific 13 C.F.R. § 125.18).

Amongst other changes, "[t]he rule also propose[d] to add clarifying language to the introductory text of [13 C.F.R.] § 121.103(h) to recognize that, although a joint venture cannot be populated with individuals intended to perform contracts awarded to the joint venture, the joint venture *can directly employ administrative personnel and such personnel may specifically include Facility Security Officers.*"  84 Fed. Reg. at 60,848 (emphasis added); *id.* at 60,868 (the proposed 13 C.F.R. § 121.103(h) revision).  The proposed rule further explained the SBA's position with regard to facility clearance issues: "if it is established that the security portion of the contract requiring a facility security clearance is ancillary to the principal purpose of the procurement, SBA believes that the non-lead partner to the joint venture (which may include a large business mentor) could possess such clearance.  *Id.* at 60,848 (requesting "comments on this possible provision as well as other recommendations regarding how best to address this perceived problem"); *see also id.* at 60,868 (detailing the text of the proposed revision).

Given the comprehensive nature of the proposed revisions, SBA provided an extended comment period, and ultimately received 189 comments on the proposed rule.  85 Fed. Reg. at 66,146 (explaining the timeline and number of comments); *id.* at 66,167 ("In response to the proposed rule, SBA also received comments seeking clarification of certain other requirements applicable to joint ventures.").  Amongst the commenters was the American Bar Association's Public Contract Law Section ("ABA PCLS"), which submitted extensive comments to SBA regarding its proposed rule.  ECF No. 1-3 at 33–62 ("PCLS Comments"); ECF No. 25-5 at 1887 (also containing the PCLS Comments).  Of

---

[13] *See* 13 C.F.R. § 124.1 ("Sections 8(a) and 7(j) of the Small Business Act authorize a Minority Small Business and Capital Ownership Development program (designated the 8(a) Business Development or '8(a) BD' program . . . ).  The purpose of the 8(a) BD program is to assist eligible small disadvantaged business concerns compete in the American economy through business development."); 15 U.S.C. §§ 636–37 (the 8(a) BD program's statutory authority); *8(a) Business Development Program*, Small Bus. Admin., https://www.sba.gov/federal-contracting /contracting-assistance-programs/8a-business-development-program (last visited Mar. 22, 2023).

particular relevance here, the PCLS Comments critiqued the regulation's "lack [of] a clear definition for 'managing partner,'" a circumstance which the PCLS Comments asserted "has led to confusion and concern as to the powers and responsibilities mandated for this position."  ECF No. 1-3 at 38 (focusing on language in 13 C.F.R. § 125.8 that also appeared in 13 C.F.R. § 125.18).  According to the PCLS Comments, neither "the regulations [n]or caselaw provide guidance on the level of rights that the non-managing venturer may have without rising to the level of impermissible control or negative control."  *Id.* at 39. The PCLS Comments asserted that "mentors and protégés would benefit from clearer direction."  *Id.*

Accordingly, the PCLS Comments recommended that SBA adopt the following definition of "managing venturer" to clarify the roles of the parties to a compliant MPP joint venture agreement:

> The "managing venturer" is responsible for controlling the day-to-day management and administration of the contractual performance of the joint venture, but other venturers may fully and equally participate in all corporate governance activities and decisions of the joint venture as is commercially customary.

ECF No. 1-3 at 39 (asserting that "[t]his proposed definition is consistent with OHA's case law concerning the managing venturer's role in other contexts").

On October 16, 2020, SBA issued its final version of the November 8, 2019, proposed rule.  85 Fed. Reg. at 66,146.  In that final rule, SBA adopted the PCLS's proposed definition of "managing venturer," albeit with some modification:

> The managing venturer is responsible for controlling the day-to-day management and administration of the contractual performance of the joint venture, but other partners to the joint venture may participate in all corporate governance activities and decisions of the joint venture as is commercially customary.

85 Fed. Reg. at 66,193, 66,196 (amending 13 C.F.R. § 125.8(b)(2)(ii)(A) and 13 C.F.R. § 125.18(b)(2)(ii)(A), respectively, to add the same language, effective November 16, 2020).[14]  Notably, while the SBA omitted the phrase "fully and equally" from the

---

[14] 13 C.F.R. § 125.18(b)(2)(ii) was recodified at 13 C.F.R. § 128.402(c)(2), as of January 1, 2023.  *See* Veteran-Owned Small Business and Service-Disabled Veteran-Owned Small Business—Certification, 87 Fed. Reg. 73,400, 73,406 (Nov. 29, 2022).  As previously noted above, *see supra*

proposed PCLS definition, ECF No. 1-3 at 39, the SBA's final rule and associated commentary did not shed any light on the provision, the reason for its adoption, or the rationale for the agency's edits to the wording the PCLS Comments had proposed.

Adjacent to the new requirement defining the role of the managing venturer vis-à-vis other joint venture participants, the regulatory revision provides that joint venture agreements must designate "a named employee of the small business managing venturer as the manager with ultimate responsibility for performance of the contract (the 'Responsible Manager')." 85 Fed. Reg. at 66,193 (13 C.F.R. § 125.8(b)(2)(ii)); *id.* at 66,196 (13 C.F.R. § 125.18(b)(2)(ii), adding the same text but replacing "the small business managing venturer" with "the SDVO SBC managing venturer"). With respect to this revision, SBA explained that the critical point is not the "title of the individual . . . , but rather the responsibilities." 85 Fed. Reg. at 66,167. In other words, "[t]he provision seeks to require that the individual *responsible for performance* must come from the small business managing venture." *Id.* (emphasis added).

The final rule also adopted the proposed rule that the "non-lead partner to the joint venture (which may include a large business mentor) could possess" any required facility security clearance where "the security portion of the contract requiring" such a clearance "is ancillary to the principal purpose of the procurement." 85 Fed. Reg. at 66,149 (describing the change). Thus, "the lead small business partner to the joint venture must possess the required facility clearance" only "[w]here a facility security clearance is required to perform *primary and vital requirements* of a contract." *Id.* at 66,180 (emphasis added) (promulgating 13 C.F.R. § 121.103(h)(4)(i)); *see id.* (13 C.F.R. § 121.103(h)(4)(ii)) ("Where the security portion of the contract . . . is ancillary to the principal purpose of the procurement, the partner to the joint venture that will *perform* th[e] work must possess the required facility security clearance." (emphasis added)).

## II.   PROCEDURAL HISTORY AND FACTUAL BACKGROUND[15]

On March 15, 2021, the Missile Defense Agency ("MDA") issued Solicitation No. HQ0858-21-R-0010 (the "Solicitation" or "RFP"), seeking "advisory and assistance

---

note 5, all references in this opinion to 13 C.F.R. § 125.18 are to the 2022 version that SBA OHA applied in this case (unless specified otherwise).

[15] This background section constitutes the Court's findings of fact drawn from the administrative record. Rule 52.1 of the Rules of the United States Court of Federal Claims, covering judgment on the administrative records, "is properly understood as intending to provide for an expedited trial on the record" and requires the Court to "make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354, 1356 (Fed. Cir. 2005). Citations to the administrative record, *see* ECF Nos. 25-2 to 25-5, are denoted as "AR" followed by the page number. ECF No. 25-2 begins with AR 1. ECF No. 25-3 begins with

services supporting facilities sustainment and operations."   AR 3482; AR 4524 (RFP Attach. J-01).  MDA amended the RFP seven times, with the final amendment issued on June 4, 2021.  AR 5124 (amendment cover page).  The RFP was "a competitive Service-Disabled Veteran-Owned Small Business (SDVOSB) set-aside."  AR 5127 (RFP § A); *see also* AR 5069 (RFP § L.2.1) (providing that "[t]he Government intends to award a competitive [SDVOSB] . . . contract under FAR Part 15").  Although MDA planned to award the contract without discussions, AR 5069 (RFP § L.2.2), the CO would establish a competitive range "[i]f discussions are to be conducted."  AR 5069–70 (RFP §§ L.2.2–.3).  Proposals not in the competitive range "will be eliminated from consideration for award."  AR 5070 (RFP § L.2.3).

MDA instructed offerors to submit initial proposals on or before June 11, 2021.  AR 4132 (RFP amend. 4 cover page); AR 5065 (RFP § L.1.4).  In response to the Solicitation, six offerors submitted proposals.  AR 345.  MDA established a competitive range that included only SAS and DIS.  ECF No. 39 ("Tr.") at 42:15–21.  MDA required final proposal revisions ("FPRs") from SAS and DIS on or before March 31, 2022.  AR 63; AR 3466.  SAS submitted its FPR on March 28, 2022.  AR 1287.

SAS is a Virginia limited liability company that is a joint venture between Strategic Alliance Business Group LLC ("SABG") and BCF Solutions, Inc. ("BCF").  AR 915 (Joint Venture and Operating Agreement ("JVOA")).  SABG and BCF entered into the SAS JVOA on July 10, 2019, to "compete for and perform, if awarded, contracts issued by [MDA] . . . and other similar federal agencies . . . as service-disabled veteran-owned small business ('SDVOSB') . . . set-aside procurements."  *Id.*  The JVOA explained that SABG, "a small business and a verified SDVOSB," and BCF, "a large business [that] . . . has the capacity and capabilities to assist SABG," planned to pursue contracts through SAS following the SBA's approval of their Mentor-Protégé Agreement.  *Id.; see also* AR 946 (noting SABG and BCF "have a Mentor-Protégé Agreement approved by SBA").

The SAS JVOA included the following provisions at issue in this case:

> 5.4. Required Approval of Members [*i.e.*, SABG or BCF].  Notwithstanding anything to the contrary in this Agreement, none of the Company, the Management Committee, the Managers, the Project Manager, or the Members shall undertake any of the following without the unanimous approval of the Members:
>
> . . . .

---

AR 65.  ECF No. 25-4 begins with AR 1577.  ECF No. 25-5 begins with AR 3457.  Additional findings of fact are made throughout Part V.

> 5.4.6. Initiation of any claim or litigation under
> the Contracts and any final decision to continue
> prosecution of or settle such litigation or claim;

AR 925 (emphasis omitted); AR 915 (defining members).

On June 8, 2022, MDA notified DIS that SAS was the apparent successful offeror. AR 102 (Preaward Notification to Unsuccessful Offeror). On June 10, 2022, MDA notified DIS that MDA awarded the contract to SAS because its proposal "was deemed to provide the overall best value." AR 345.[16]

On June 15, 2022, DIS challenged SAS's status as a SDVOSB concern before the SBA. AR 96 (Status Protest of SAS).[17] DIS argued that SAS's JVOA does not comply with 13 C.F.R. § 125.18(b)(2), although DIS did not specifically challenge JVOA Section 5.4.6 in its protest argument. AR 99–101 (Status Protest of SAS). On July 29, 2022, SBA's Deputy Director for the Office of Government Contracting and Business Development ("DD/GC") concluded,[18] among other things, that the JVOA at issue "allows BCF negative control over matters beyond the Extraordinary Circumstances outlined in 13 C.F.R. § 125.11." AR 78–81 (DD/GC decision). Accordingly, the DD/GC concluded that SAS did not qualify as a permissible joint venture for an SDVOSB set-aside procurement pursuant to 13 C.F.R. § 125.18(b)(2)(ii)(A). *Id.*

On August 15, 2022, SAS appealed the DD/GC decision to SBA OHA, arguing that "none of the provisions in Section 5.4 [of SAS's JVOA] provide impermissible negative control to BCF or prevent SABG from qualifying as the managing venturer." AR 12, 16–17 (Petition of Appeal from SDVO SBC Status Determination) (addressing JVOA Section 5.4.6). DIS responded on August 25, 2022. *See* AR 59–60 (DIS Response to Appeal) (discussing JVOA Section 5.4.6).

---

[16] The merits of MDA's procurement award decision are not before the Court in this case.

[17] DIS also filed a separate size protest "based on the same facts" but that is not at issue in the above-captioned case currently before this Court. AR 96; *see also* ECF No. 27 at 4 n.3 (describing this protest as pending).

[18] The Office of Government Contracting and Business Development had initial responsibility for resolving an SBA status protest. *See* William B. Shear, U.S. Gov't Accountability Off., GAO-17-573, Small Business Administration: Government Contracting and Business Development Processes and Rule-Making Activities 13 (2017) ("[T]he Office of Government Contracting within [the Office of Government Contracting and Business Development] . . . conducts SDVOSB eligibility protest reviews to help ensure that only eligible SDVOSBs receive contracts set aside for this group."); 13 C.F.R. § 125.30(g)(1)–(2) (effective August 24, 2016, through December 31, 2022) (referencing protest decisions by the DD/GC); *but see* 13 C.F.R. §§ 134.1001(a), 134.1003(d) (current versions).

On September 22, 2022, OHA concluded that DD/GC erred on several points but "did not err in finding that [SAS's] JVOA failed to comply with . . . 13 C.F.R. § 125.18(b)(2)(ii)." AR 5293–95 (*Strategic All. Sols. LLC*, SBA No. VET-277, 2022 WL 6136436, at *10–13 (Sept. 22, 2022)). Specifically, according to OHA, SAS did not qualify as an SDVOSB because "initiating litigation for 'Contracts' under [JVOA] Section 5.4.[6] requires unanimous approval, allowing BCF negative control beyond extraordinary circumstances." AR 5295 (*Strategic All. Sols.*, 2022 WL 6136436, at *13).

On October 20, 2022, SAS filed suit in this Court pursuant to 28 U.S.C. § 1491(b), challenging OHA's conclusion that SAS did not qualify as an SDVOSB because of JVOA Section 5.4.6. Complaint at 10–11, *Strategic All. Sols. LLC v. United States*, No. 22-1562 (Fed. Cl. Jan. 23, 2023), ECF No. 1. SAS's complaint contained four counts: (1) that OHA did not evaluate Section 5.4.6 of SAS's JVOA pursuant to the then-current version of 13 C.F.R. § 125.18(b)(2)(ii), *id.* at 18–20; (2) OHA's decision was irrational as it lacked explanation, *id.* at 20–24; (3) OHA's decision was irrational in its reliance on OHA precedent, *id.* at 24–27; and (4) DD/GC's errors meant OHA should have at least remanded the dispute to DD/GC, *id.* at 27–28. On October 21, 2022, DIS filed an unopposed motion to intervene, *Strategic All. Sols.*, No. 22-1562, ECF No. 11, which the Court granted, *see* October 21, 2022, Minute Order.

On November 18, 2022, the government filed a consent motion for voluntary remand of SAS's case. Defendant's Consent Motion for Voluntary Remand, *Strategic All. Sols.*, No. 22-1562, ECF No. 34. The government explained that it and SAS "agreed that OHA's decision should be reversed 'because Section 5.4.6 of the [SAS] JVOA is permissible under 13 C.F.R. § 125.18(b)(2)(ii)(A) and SAS is an eligible SDVO SBC joint venture.'" *Id.* at 3 (alteration in original) (quoting Joint Stipulation for Entry of Final Judgment ¶ 5, *Strategic All. Sols.*, No. 22-1562, ECF No. 29). The government further contended that "OHA did not . . . address how the regulation [13 C.F.R. § 125.18(b)(2)(ii)(A)] should be interpreted or applied to Section 5.4.6 of the SAS JVOA." *Id.* at 4. A remand would thus "ensure a meaningful judicial review if post-remand proceedings are necessary." *Id.*

As SAS (the then-Plaintiff) and DIS (the then-Defendant-Intervenor) consented to the government's requested voluntary remand, *id.* at 1, this Court adopted the remand instructions in the government's consent motion, *Strategic All. Sols. LLC v. United States*, 2022 WL 17097233, at *2 (Fed. Cl. Nov. 21, 2022). In particular, the undersigned instructed that, on remand, "OHA's reconsideration shall be limited to OHA's conclusion that Section 5.4.6 of SAS's [JVOA] . . . runs afoul of 13 C.F.R. § 125.18(b)(2)(ii)(A)." *Id.* The Court instructed OHA to issue a new decision on or before January 13, 2023, and the parties to file a joint status report on or before January 20, 2023. *Id.* On January 19, 2023, the parties filed a joint status report, Joint Status Report, *Strategic All. Sols.*, No. 22-1562, ECF No. 36, and SAS filed a motion to withdraw its complaint, Plaintiff's Motion to

Withdraw, *Strategic All. Sols.*, No. 22-1562, ECF No. 37.  The Court granted the motion to withdraw, finding the case moot.  Order, *Strategic All. Sols.*, No. 22-1562, ECF No. 38.

On remand, OHA reversed itself, finding in a January 12, 2023, decision — now at issue before this Court — that the DD/GC "was in error" and that Section 5.4.6 of SAS's JVOA "does not deprive SABG of its control of day-to-day management and administration of contract performance."  AR 5437–38 (*Strategic All. Sols. LLC*, SBA No. VET-278, 2023 WL 580566, at *15 (Jan. 12, 2023)).  OHA began its new decision by reviewing OHA precedents it had considered in its September 22, 2022, decision, and recognizing that they did not involve the amended version of 13 C.F.R. § 125.18(b)(2)(ii).  AR 5436 (*Strategic All. Sols.*, 2023 WL 580566, at *13–14) (describing *Seventh Dimension, LLC*, SBA No. VET-6057, 2020 WL 3411520 (June 11, 2020); *S. Contracting Sols. III*, SBA No. SIZ-5956, 2018 WL 4492382 (Aug. 30, 2018); and *Swift & Staley, Inc.*, SBA No. SIZ-6125, 2021 WL 5298760 (Nov. 1, 2021)); *see* AR 5437 (*Strategic All. Sols.*, 2023 WL 580566, at *14) (concluding that *Southern Contracting Solutions* and *Swift & Staley* were size protests to which 13 C.F.R. § 125.18(b)(2)(ii)(A) did not apply and that *Seventh Dimension* predated the 2020 amendment).[19]   These precedents were therefore "inapposite."   AR 5437 (*Strategic All. Sols.*, 2023 WL 580566, at *14)

OHA then examined the amended 13 C.F.R. § 125.18(b)(2)(ii)(A) as applied to the subject of initiating and settling litigation addressed in JVOA Section 5.4.6.  OHA understood the scope of the second clause of the revised 13 C.F.R. § 125.18(b)(2)(ii)(A) — "all corporate governance activities and decisions of the joint venture as is commercially customary" — to cover two subjects:  (1) corporate governance; and (2) decisions that routinely involve joint venture partners.  *See* AR 5437 (*Strategic All. Sols.*, 2023 WL 580566, at *14) ("[W]hile the SDVO SBC member of a joint venture controls contract administration and performance, the other member takes part in *general business decisions of the joint venture, as is customary for participants in a joint venture to do*." (emphasis added)).  According to OHA, the decisions covered by JVOA Section 5.4 "are clearly the type of decision" for which OHA allows "unanimous consent, in order to protect a minority member's interest."  *Id.*  OHA saw no reason to treat claims, litigation, and settlement differently, similarly concluding:

> Litigation regarding the contracts is not part of the day-to-day management of contract performance.  Rather, it is more properly seen as part of corporate governance and is thus an area where the other partners to the joint venture may participate.  Litigation on behalf of the joint venture can have results which might impair the interests of the venturers, and

---

[19] AR 5437 (*Strategic All. Sols.*, 2023 WL 580566, at *14) (highlighting the 2020 amendment's addition of "the phrase explicitly providing that the joint venture's minority members could participate in corporate governance").

> thus it is not inappropriate that BCF have the right to approve
> contract litigation.

AR 5437–38 (*Strategic All. Sols.*, 2023 WL 580566, at *15). Thus, OHA determined that its previous, September 22, 2022, decision — finding that JVOA Section 5.4.6 failed to comply with 13 C.F.R. § 125.18(b)(2)(ii)(A) — "was in error." *Id.*

On January 18, 2023, DIS initiated the above-captioned case by filing suit in this Court pursuant to 28 U.S.C. § 1491(b). ECF No. 1 ("Compl."). SAS filed an unopposed motion to intervene, ECF No. 16 at 1, which the Court granted, *see* January 19, 2023, Minute Order.

DIS asserts that OHA's new decision regarding 13 C.F.R. § 125.18(b)(2)(ii)(A) and Section 5.4.6 of SAS's JVOA is arbitrary and capricious. Compl. at 3. First, DIS alleges that the initiation of claims and litigation pursuant to SAS's contracts impacts SAS's day-to-day management and contractual performance, so OHA's January 12, 2023, decision about Section 5.4.6 is contrary to 13 C.F.R. § 125.18(b)(2)(ii)(A). *Id.* ¶¶ 23–31 (Count I).[20] Second, DIS argues that if OHA's new decision at issue is correct — such that SBA's 2020 changes to 13 C.F.R. § 125.18(b)(2)(ii)(A) altered the permissible powers of a joint venture mentor — that would mean the 2020 change violated the Administrative Procedures Act (APA) requirements for notice and comment. *Id.* ¶¶ 32–45 (Count II). Third, DIS contends that OHA's January 12, 2023, decision was arbitrary and capricious because the DD/GC did not make an obvious error of fact or law when it found JVOA Section 5.4.6 inconsistent with 13 C.F.R. § 125.18(b)(2)(ii)(A) and, thus, OHA could not reverse the DD/GC decision. *Id.* ¶¶ 46–55 (Count III). In sum, DIS contends that OHA's new decision on remand is inconsistent with 13 C.F.R. § 125.18(b)(2)(ii)(A), the APA, and OHA's own standards of review. DIS asks this Court to reverse and vacate OHA's January 12, 2023, decision, find that SAS is not an SDVOSB due to Section 5.4.6 of the JVOA, and issue related injunctive relief. *Id.* at 16.

On February 8, 2023, DIS filed a timely motion for judgment on the administrative record ("MJAR") pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). ECF No. 26-1 ("Pl. MJAR"). On the same day, the government and

---

[20] DIS clearly takes issue only with the part of Section 5.4.6 of SAS's JVOA requiring that both joint venture parties approve the initiation of claims and litigation. *See* Compl. ¶¶ 26–27, 29–31 (alleging that "[i]nitiating litigation or a claim" must be within the sole control of the managing venturer). DIS does not challenge the part of JVOA Section 5.4.6 concerning the continuation or settlement of claims and litigation. *See* AR 925 (JVOA Section 5.4.6) ("[A]ny final decision to continue prosecution of or settle such litigation or claim[.]"); *see also* ECF No. 26-1 at 1, 13 (DIS's motion for judgment on the administrative record challenging JVOA Section 5.4.6 to the extent "[i]t requires both venturers to agree before SAS brings 'any claim or litigation under the Contracts'").

SAS each filed a timely motion to dismiss and a timely MJAR.  ECF No. 27 ("Def. MJAR"); ECF No. 28 ("Def.-Int. MJAR").  On February 17, 2023, the parties filed timely response briefs.  ECF No. 34 ("Pl. Resp."); ECF No. 32 (government); ECF No. 33 (SAS).

On February 23, 2023, the Court held oral argument on the parties' cross-MJARs.

## III.   JURISDICTION & STANDING

The Tucker Act provides that an "interested party" may file an "action" in this Court "objecting [1] to a solicitation by a Federal agency for bids or proposals for a proposed contract or [2] to a proposed award or [3] the award of a contract or [4] any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1); *see also Aero Spray, Inc. v. United States*, 156 Fed. Cl. 548, 559 & n.18 (2021) ("Section 1491(b) actions are typically referred to as 'bid protests.'").[21]  This Court has jurisdiction to review SBA OHA decisions under the fourth prong of § 1491(b)(1).  *Palladian Partners, Inc. v. United States*, 783 F.3d 1243, 1254 (Fed. Cir. 2015) (agreeing with *RLB Contracting, Inc. v. United States*, 118 Fed. Cl. 750, 756 (2014), that "[d]ecisions of SBA's OHA are reviewable under [the Tucker Act's] grant of authority"); *22nd Century Techs., Inc. v. United States*, 57 F.4th 993, 999 (Fed. Cir. 2023) ("Where an SBA decision is made 'in connection with a proposed procurement,' the Claims Court would normally have jurisdiction to review that decision under § 1491(b)(1)." (citing *Palladian Partners*, 783 F.3d at 1254)).

"Standing is an integral part of jurisdiction."  *Seventh Dimension, LLC v. United States*, 160 Fed. Cl. 1, 14 (2022) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "The party invoking federal jurisdiction bears the burden of establishing standing." *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018) (citing *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002)). "Where a plaintiff lacks standing, its case must be dismissed pursuant to RCFC 12(b)(1)." *Aero Spray, Inc.*, 156 Fed. Cl. at 556 (citing *Media Techs. Licensing, LLC v. Upper Deck Co.*, 334 F.3d 1366, 1370 (Fed. Cir. 2003)).

To establish standing in a § 1491(b) action, a plaintiff must demonstrate that it is an "interested party."  *Aero Spray, Inc.*, 156 Fed. Cl. at 559 ("[T]he Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, . . . defines not only this Court's jurisdiction over *what* actions may be brought against the government, but also *who* has

---

[21] *Cf. Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 96–97 (2020) ("[A]lthough '[the Administrative Dispute Resolution Act] covers *primarily* pre- and post-award bid protests,' the Federal Circuit in *RAMCOR* explicitly reversed this Court's determination 'that a [plaintiff] could only invoke § 1491(b)(1) jurisdiction by including in its action an attack on the merits of the underlying contract award' or the solicitation." (third alteration in original) (quoting *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999))).

standing to pursue them.").  In a post-award protest action, such as the instant case, an "interested party" is "[1] an actual or prospective bidder or offeror [2] whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (quoting 31 U.S.C. § 3551(2)).

In this case, the government conceded that there are only two offerors remaining in the procurement following MDA's formation of a competitive range: Plaintiff, DIS; and Defendant-Intervenor, SAS (the contract awardee).  Tr. 42:15–21.  If SAS is ineligible for the contract award due to noncompliance with a joint venture regulation applicable in a SDVOSB procurement, DIS necessarily has a substantial chance at obtaining the contract and, thus, possesses standing as an interested party to challenge SBA OHA's decision. *See VAS Realty, LLC v. United States*, 26 F.4th 945, 950 (Fed. Cir. 2022).

## IV.     STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 1491(b)(4), this Court applies the standard of review contained in the APA § 10(e), 5 U.S.C. § 706.  *Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 981 (Fed. Cir. 2019).  In particular, in accordance with the APA, this Court reviews an agency's procurement decisions to determine whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

"In applying the APA standard of review, this Court affords considerable deference to an agency's procurement decisions."  *IAP Worldwide Servs., Inc. v. United States*, 159 Fed. Cl. 265, 286 (2022) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000)).  In reviewing an agency's procurement decision, the Court "determine[s] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'"  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (quoting *Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)).  A plaintiff succeeds on the merits where it demonstrates, based on a trial on the administrative record,[22] that either:  "(1) the [agency]'s decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Id.* at 1332 (citing cases).

DIS's complaint in this case requires this Court to assess SBA OHA's interpretation and application of 13 C.F.R. § 125.18(b)(2)(ii)(A).  "When interpreting a regulation, we start by exhausting all traditional tools of interpretation to determine whether the plain meaning of the regulation can be discerned or whether it is truly ambiguous."  *Cranford v. McDonough*, 55 F.4th 1325, 1328 (Fed. Cir. 2022) (citing *Kisor v. Wilkie*, -- U.S. --, 139 S. Ct. 2400, 2415 (2019)).  Thus, "[r]egulatory interpretation uses a similar analytical

---

[22] *See Bannum*, 404 F.3d at 1354–56.

framework as is applied to statutory interpretation," *Goodwill Indus. of S. Fla., Inc. v. United States*, 162 Fed. Cl. 160, 192 (2022), with this Court examining "the text, structure, history, and purpose of a regulation before resorting to deference," *Kisor*, 139 S. Ct. at 2415 (citing *Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 843 & n.9 (1984) (applying the same approach for ambiguous statutes)). When the text is unambiguous, the court need only read and apply the plain language of the regulation. *See Breland v. McDonough*, 22 F.4th 1347, 1353 (Fed. Cir. 2022); *see also Dixon v. United States*, 147 Fed. Cl. 469, 476 (2020) (holding that where a "regulation is clear," this Court "merely has to apply the regulation" and "[n]o interpretation is needed, and no deference to the [agency]'s interpretation is given").

Only after exhausting all "traditional tools" of regulatory interpretation and finding a regulation is "genuinely ambiguous" may courts consider applying what has been termed *Auer* or *Seminole Rock* deference. *Kisor*, 139 S. Ct. at 2408, 2414–15 (quoting *Chevron*, 467 U.S. at 843 & n.9, and discussing *Auer v. Robbins*, 519 U.S. 452 (1997), and *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945), with other cases). Pursuant to *Auer* or *Seminole Rock* deference, courts must defer to an agency's reasonable interpretation of the agency's own "genuinely ambiguous" regulations. *Id.* at 2414–16 (citing *Auer*, 519 U.S. 452, *Seminole Rock*, 325 U.S. 410, and other Supreme Court cases).

*Auer* deference, however, is only appropriate if the "character and context of the agency interpretation entitles it to controlling weight." *Kisor*, 139 S. Ct. at 2415–16 (citing *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)). The Supreme Court has identified "some especially important markers" courts must consider in deciding when an agency's interpretation of a regulation merits *Auer* deference, including: "the regulatory interpretation must be one actually made by the agency"; "the agency's interpretation must in some way implicate its substantive expertise"; and "[f]inally, an agency's reading of a rule must reflect 'fair and considered judgment.'" *Kisor*, 139 S. Ct. at 2416–17 (citing cases). In contrast, this Court may "not defer to an agency's interpretation of a regulation when the evidence shows that 'the proffered interpretation runs contrary to the intent of the agency at the time of enactment of the regulation.'" *United Steel & Fasteners, Inc. v. United States*, 947 F.3d 794, 802 (Fed. Cir. 2020) (quoting *Gose v. U.S. Postal Serv.*, 451 F.3d 831, 837 (Fed. Cir. 2006) (citing *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988))).

Particularly following *Kisor*, the precise line between *Auer* deference and the type of deference the Supreme Court identified in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), is difficult to discern. In *Skidmore*, the Supreme Court held that "rulings, interpretations and opinions" of an agency, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore*, 323 U.S. at 140 ("The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later

pronouncements, and all those factors which give it power to persuade, if lacking power to control."). While *Skidmore* may apply to an agency's interpretation of its own regulation even where that interpretation does not merit *Auer* deference, *see Christopher*, 567 U.S. at 159, the distinction between the two types of deference is exceedingly thin, at best.[23]

There is a further difficulty: even after *Kisor*, there are strains of Federal Circuit jurisprudence — and this Court's precedent — that employ the deference prism with less rigor than what *Kisor* seems to require. For example, the Federal Circuit has invoked the far more "general rule[] [that] we must defer to an agency's interpretations of the regulations it promulgates, as long as the regulation is ambiguous and the agency's interpretation is neither plainly erroneous nor inconsistent with the regulation." *Green v. Off. of Pers. Mgmt.*, 823 F. App'x 940, 944 (Fed. Cir. 2020) (quoting *Gose*, 451 F.3d at 836).

And specifically regarding our Court's review of SBA OHA decisions, a long line of cases "afford '*special deference*' to decisions by the OHA due to the SBA's 'quasi-technical administrative expertise and a familiarity with the situation acquired by long experience with the intricacies inherent in a comprehensive regulatory scheme.'" *Swift & Staley, Inc. v. United States*, 159 Fed. Cl. 494, 503 (2022) (emphasis added) (first quoting *Baird Corp. v. United States*, 1 Cl. Ct. 662, 666 (1983); and then citing *Eagle Design & Mgmt., Inc. v. United States*, 57 Fed. Cl. 271, 273 (2002), amongst other cases), *aff'd*, 2022 WL

---

[23] *See Kisor*, 139 S. Ct. at 2424–25 (Roberts, C.J., concurring in part) ("[T]here is a difference between holding that a court ought to be persuaded by an agency's interpretation [pursuant to *Skidmore*] and holding that it should defer to that interpretation under certain conditions [pursuant to *Auer*]. But . . . the cases in which *Auer* deference is warranted largely overlap with the cases in which it would be unreasonable for a court not to be persuaded by an agency's interpretation of its own regulation."); *id.* at 2445–46 (Gorsuch, J., concurring in the judgment) ("[U]ncertainty surrounding *Auer*'s scope and application had caused many to question whether there was any 'practical benefit' in continuing to apply *Auer* 'rather than a less deferential but more flexible and open-ended standard like *Skidmore*.'" (quoting Kristin E. Hickman & Mark R. Thomson, *The Chevronization of* Auer, 103 Minn. L. Rev. Headnotes 103, 110 (2019))); *see also* Jeffrey A. Pojanowski, *Revisiting* Seminole Rock, 16 Geo. J.L. & Pub. Pol'y 87, 88–89 (2018) (explaining that "any justification for *Auer*'s rule of deference rested on *Seminole Rock*" and arguing that "[a] closer look at *Seminole Rock* suggests an unremarkable application of the less-deferential standard of review of *Skidmore v. Swift & Co.*"); Aditya Bamzai, *Delegation and Interpretive Discretion:* Gundy, Kisor, *and the Formation and Future of Administrative Law*, 133 Harv. L. Rev. 164, 190 (2019) ("*Kisor* stresses the limitations on the proper application of *Auer* deference in a manner that all but collapses the inquiry into the Court's fallback option, *Skidmore*."); Raymond Yang, *In the Shadow of* Skidmore *and* Seminole Rock*:* Chevron *and* Auer *Deference and Their Conceits*, FedSoc Blog (Dec. 7, 2021), https://fedsoc.org/commentary/fedsoc-blog/in-the-shadow-of-skidmore-and-seminole-rock-chevron-and-auer-deference-and-their-conceits ("Doing away with *Chevron* would leave *Skidmore* deference. Doing away with *Auer-Kisor* would also leave *Skidmore* deference. . . . Whether one talks about *Chevron* or *Auer*, it's *Skidmore* all the way down.").

17576348 (Fed. Cir. Dec. 12, 2022) (per curiam) (summary affirmance pursuant to Fed. Cir. R. 36); *see also Darton Innovative Techs., Inc. v. United States*, 153 Fed. Cl. 440, 451 (2021) ("Unless the plaintiff can show that the OHA acted in violation of an unambiguous statutory or regulatory requirement, special deference is appropriate.").[24]   The Federal Circuit has made similar pronouncements about other agencies and the regulatory schemes they administer.  *See Am. Express Co. v. United States*, 262 F.3d 1376, 1382–83 (Fed. Cir. 2001) ("Accounting determinations are entitled to *particular deference*, in view of the broad authority conferred to the [IRS] Commissioner . . . . In the context of tax cases, the IRS's reasonable interpretations of its own regulations and procedures are entitled to particular deference." (emphasis added) (citing precedent)).[25]

The provenance of such "special deference" (or "particular deference") language, at least as applied to the SBA, appears to originate with this Court's predecessor tribunal, the United States Claims Court.  *See Baird Corp.*, 1 Cl. Ct. at 666.  In *Baird Corp.*, the Claims Court in turn relied upon a decision of the United States Court of Appeals for the Fifth Circuit to conclude that the SBA's view "is entitled to considerable weight since it 'incorporates quasi-technical administrative expertise and a familiarity with the situation acquired by long experience with the intricacies inherent in a comprehensive regulatory scheme.'"  *Id.* (quoting *Allen M. Campbell Co. Gen. Contractors v. Lloyd Wood Constr. Co.*, 446 F.2d 261, 265 (5th Cir. 1971)).  But that Fifth Circuit opinion — while addressing an SBA size determination — did nothing more than apply *Seminole Rock* deference.  *See Allen M. Campbell Co.*, 446 F.2d at 265 ("But it is an axiom of judicial review that an administrative agency's interpretation of its own regulations must be accorded the

---

[24] *See also Superior Optical Labs, Inc. v. United States*, 158 Fed. Cl. 262, 273 (2022) ("Decisions made by OHA are given further 'special deference' where the SBA's expertise and familiarity with administrative rules and intricacies are at issue." (first quoting *Obsidian Sols. Grp., LLC v. United States*, 153 Fed. Cl. 334, 341–42 (2021); and then citing *Eagle Design*, 57 Fed. Cl. at 273)); *Team Waste Gulf Coast, LLC v. United States*, 135 Fed. Cl. 683, 687 (2018) (explaining that the Court gives "special deference" to OHA decisions "because of the SBA's 'quasi-technical administrative expertise and [its] familiarity with the situation acquired by long experience with the intricacies inherent in a comprehensive regulatory scheme" (alteration in original) (quoting *LB & B Assocs., Inc. v. United States*, 68 Fed. Cl. 765, 771 (2005))).

[25] *See also Rio Grande, El Paso & Santa Fe R.R. Co. v. Dep't of Energy*, 234 F.3d 1, 6 (Fed. Cir. 2000) ("We also give substantial deference to [DOE] OHA's interpretation of the statutes it is charged with administering, and its interpretation of the implementing regulations DOE has promulgated[.]" (citing cases)).  More generally, in the procurement protest context, the Federal Circuit has deferred to an agency's interpretation of a FAR provision even when that agency is not solely responsible for administering it.  *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1323 (Fed. Cir. 2003) (deferring to agency interpretation where that agency engaged in "a reasonable interpretation of the acquisition regulations to view [evaluation notices] as clarifications" instead of discussions).  Whether these pre-*Kisor* cases remain good law is not for this Court to decide, at least not in this case.

greatest deference." (citing *Seminole Rock*, 325 U.S. at 413–14, and *Udall v. Tallman*, 380 U.S. 1, 16–17 (1965) (applying *Seminole Rock*)).[26]

All of that is a long way of explaining that the deference owed to an SBA OHA decision isn't "special" at all, but rather is nothing more or less than either (a) an application of *Auer* or *Seminole Rock* deference where the regulation at issue is "hopelessly ambiguous," *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 223 F. Supp. 3d 1008, 1022–23 (C.D. Cal. 2016) (applying "*Chevron* and *Auer* deference to the agency's interpretation of the relevant statutes and regulations, respectively"), or (b) the deference courts give to reasonable and persuasive agency interpretations under *Skidmore*, applying the typical APA standard of review.  In that regard, Judge Hertling in *Darton Innovative Technologies* explained that deference "is appropriate when the OHA is interpreting the SBA's own rules, which implement 'a comprehensive regulatory scheme' in an intricate manner that a nonexpert court must be careful not to disrupt."  153 Fed. Cl. at 451 (quoting *Eagle Design*, 57 Fed. Cl. at 271, and citing *Ceres Env't Servs., Inc. v. United States*, 52 Fed. Cl. 23, 33 (2002)); *id.* at 453 (concluding OHA's "interpretation and application of [an SBA regulation] . . . was neither arbitrary and capricious nor contrary to law").  Judge Hertling's rationale for deference to SBA OHA is perfectly consistent with *Skidmore*, which may apply even if *Auer* or *Seminole Rock* deference is improper.[27]

---

[26] This Court in *Ceres* — an oft-cited decision more recent than *Baird Corp.* that contains the "special deference" language — similarly relied on yet earlier cases that invoked *Seminole Rock*. For example, *Ceres*, 52 Fed. Cl. at 33, cited *Stellacom, Inc. v. United States*, 24 Cl. Ct. 213, 216 (1991), and *Three S Constructors, Inc. v. United States*, 13 Cl. Ct. 41, 45 (1987), both of which cited a Supreme Court case that applied *Seminole Rock*.  *See, e.g., Stellacom*, 24 Cl. Ct. at 216 (citing *Udall*, 380 U.S. at 16); *Three S*, 13 Cl. Ct. at 45 (citing *Udall*, 380 U.S. at 16).  In the years after *Stellacom* and *Three S Constructors*, Supreme Court decisions clarified that *Seminole Rock* deference is not as expansive as once described.  *See, e.g., Auer*, 519 U.S. 452 (highlighting, among other points, how only an agency's fair and considered regulatory interpretations merit deference); *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007) (describing how agencies cannot change regulatory interpretations in ways that cause unfair surprise); *Christopher*, 567 U.S. 142 (describing limits on what agency regulatory interpretations receive deference); *Kisor*, 139 S. Ct. 2400 (identifying questions a court must resolve in order to defer to an agency's regulatory interpretation).  Indeed, Judge Tapp of this Court correctly described *Seminole Rock*, *Auer*, and *Kisor* as "a line of cases that discuss the ever-shrinking deference that courts owe to agency interpretations."  *Melwood Horticultural Training Ctr., Inc. v. United States*, 153 Fed. Cl. 723, 741 (2021).

[27] Thus, an agency's interpretation of its regulations still may receive "a measure of deference proportional to the 'thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'"  *Christopher*, 567 U.S. at 159 (quoting *Skidmore*, 323 U.S. at 140); *cf. Prestonback v. United States*, 965 F.3d 1363, 1369 n.3  (Fed. Cir. 2020) ("Here, the level of deference we afford to the Government is *Skidmore* deference, which is afforded to less formal expressions of agency interpretation." (citing Supreme Court decisions)).

In sum, synthesizing the recent Federal Circuit cases with *Kisor*, this Court concludes that the deference equation essentially reduces to these four questions:

(1) Is the regulation "genuinely ambiguous"[28] after taking a serious, *de novo* approach to reading the regulation at issue, consistent with the uncontroversial proposition that "[i]t is emphatically the province and duty of the judicial department to say what the law is"?[29]

(2) If the regulation at issue is, indeed, genuinely ambiguous, is the agency's interpretation reasonable?[30]

(3) If the agency's interpretation of a genuinely ambiguous regulation is reasonable, is there some reason *not* to defer to the agency's interpretation? Such reasons may include, for example, that the new interpretation is not authoritative,[31] is a *post hoc* rationalization merely

---

[28] *Kisor*, 139 S. Ct. at 2414–15 ("*Auer* deference is not the answer to every question of interpreting an agency's rules.  Far from it[:] . . . the possibility of deference can arise only if a regulation is genuinely ambiguous.  *And when we use that term, we mean it − genuinely ambiguous*, even after a court has resorted to all the standard tools of interpretation." (emphasis added)); *see also United Steel & Fasteners, Inc.*, 947 F.3d at 800–01 (explaining that courts should not defer to an agency's interpretation of a regulation unless "the regulation is genuinely ambiguous" (quoting *Kisor*, 139 S. Ct. at 2415); *Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 48 F.4th 1307, 1313 (Fed. Cir. 2022) ("'[I]f there is only one reasonable construction of a regulation,' then a court should not defer to any conflicting agency interpretation." (quoting *Kisor*, 139 S. Ct. at 2415)); *Bullock v. United States*, 10 F.4th 1317, 1321 n.1 (Fed. Cir. 2021) (declining to give deference to an agency under *Kisor* because, among other reasons, "the meaning of the regulation can be determined without addressing the question of deference").

[29] *See Kisor*, 139 S. Ct. at 2437 (Gorsuch, J., concurring in the judgment) (alteration in original) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), and asserting that "[n]ot only is *Auer* incompatible with the APA; it also sits uneasily with the Constitution" because "Article III, § 1 provides that the 'judicial Power of the United States' is vested exclusively in this Court and the lower federal courts"); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 104 n.4 (2015) ("Even in cases where an agency's interpretation receives *Auer* deference, however, it is the court that ultimately decides whether a given regulation means what the agency says."); *id.* at 119 (Thomas, J., concurring) ("[T]he judicial power, as originally understood, requires a court to exercise its independent judgment in interpreting and expounding upon the laws.").

[30] *See, e.g.*, *United Steel & Fasteners, Inc.*, 947 F.3d at 802 (rejecting an agency's interpretation as "not 'within the bounds of reasonable interpretation'" (quoting *Kisor*, 139 S. Ct. at 2416 (majority opinion) (internal quotations omitted in original))).

[31] *Kisor*, 139 S. Ct. at 2416–17 ("Not everything the agency does comes from, or is even in the name of, the Secretary or his chief advisers. . . . The interpretation must at the least emanate from those actors, using those vehicles, understood to make authoritative policy in the relevant context." (citing cases)); *see also Adams v. United States*, 59 F.4th 1349, 1361 (Fed. Cir. 2023) (no deference for

to support a litigation position,[32] constitutes unfair surprise,[33] or exceeds the agency's competence and expertise.[34]

(4) Even if *Auer* or *Seminole Rock* deference is not warranted, is the agency's interpretation nevertheless reasonable and persuasive and, thus, entitled to *Skidmore* deference under the APA standard of review?[35]

---

interpretation adopted via "the use of informal, interpretive announcements instead of formal rulemaking to make significant regulatory changes" (citing *Kisor*, 139 S. Ct at 2416)).

[32] *Kisor*, 139 S. Ct at 2417 ("[A] court should decline to defer to a merely 'convenient litigating position' or '*post hoc* rationalizatio[n] advanced' to 'defend past agency action against attack.'" (quoting *Christopher*, 567 U.S. at 155); *see also Nat'l Org. of Veterans' Advocs., Inc.*, 48 F.4th at 1316 n.3 ("An agency interpretation is not entitled to *Auer* deference when the interpretation 'does not reflect the agency's fair and considered judgment,' which may occur 'when the agency's interpretation conflicts with a prior interpretation' or is a '*post hoc* rationalization.'" (quoting *Christopher*, 567 U.S. at 155)).

[33] *Kisor*, 139 S. Ct. at 2417–18 ( "[A] court may not defer to a new interpretation, *whether or not introduced in litigation*, that creates 'unfair surprise' to regulated parties." (emphasis added) (quoting *Long Island Care*, 551 U.S. at 170)); *see also Nat'l Org. of Veterans' Advocs., Inc.*, 48 F.4th at 1315 ("[T]he primary concern of this constraint on *Auer* deference is the expectations that the agency has previously engendered." (discussing *Kisor*, 139 S. Ct at 2418)).

[34] *Kisor*, 139 S. Ct. at 2417 (noting presumption that "'Congress intended to invest interpretive power' in whichever actor was 'best position[ed] to develop' expertise about the given problem" (alteration in original) (quoting *Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 151 (1991))); *see also Laturner v. United States*, 933 F.3d 1354, 1362 (Fed. Cir. 2019) ("Even if the regulation is genuinely ambiguous, *Auer* deference is not appropriate unless 'an independent inquiry into . . . the character and context of the agency interpretation' shows that the interpretation (1) constitutes the agency's 'authoritative' or 'official position,' (2) implicates the agency's 'substantive expertise,' and (3) reflects the agency's 'fair and considered judgment' of the issue." (alteration in original) (quoting *Kisor*, 139 S. Ct. at 2416–18)).

[35] *Kisor*, 139 S. Ct. at 2414 ("[W]e presume that Congress intended for courts to defer to agencies when they interpret their own ambiguous rules. But when the reasons for that presumption do not apply, or countervailing reasons outweigh them, courts should not give deference to an agency's reading, except to the extent it has the 'power to persuade.'" (citation omitted) (quoting *Christopher*, 567 U.S. at 159)); *Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1135 (D.C. Cir. 2014) (explaining that, in an APA case, courts "generally afford substantial deference to an agency's interpretation of both a statute it administers and its own implementing regulations" (citing D.C. Circuit and Supreme Court cases)); *Suncor Energy (U.S.A.), Inc. v. United States Env't Prot. Agency*, 50 F.4th 1339, 1354–55 (10th Cir. 2022) ("There are key attributes of the EPA's decision, however, that lead us to conclude that the EPA's interpretation is not entitled to *Auer* deference and is at best entitled only to *Skidmore* deference."); *United States v. Jenkins*, 50 F.4th 1185, 1197 (D.C. Cir. 2022) (explaining that "an agency's interpretation of language common

## V.     DISCUSSION: DEFENDANTS ARE ENTITLED TO JUDGMENT

### A.  The Interpretive Problem

As explained *supra*, SAS's JVOA provides that both parties to the joint venture must approve "any claim or litigation under the Contracts and any final decision to continue prosecution of or settle such litigation or claim."  AR 925 (JVOA § 5.4.6).  Put differently, both parties to the joint venture may veto the other's decisions to file claims, pursue litigation, or settle on behalf of the joint venture.  *Id.*  The primary question DIS's complaint raises is this:  whether SBA OHA reasonably determined that SAS's JVOA Section 5.4.6 is consistent with 13 C.F.R. § 125.18(b)(2)(ii)(A).  AR 5436–37 (*Strategic All. Sols.*, 2023 WL 580566, at *14–15).  The answer to that question depends, of course, on the meaning of 13 C.F.R. § 125.18(b)(2)(ii)(A), which governs the permitted roles and responsibilities of the parties to a compliant SDVOSB joint venture in the MPP, and provides as follows:

> The [1] managing venturer is responsible for controlling the [A] day-to-day [B] management and [C] administration [D] of the contractual performance of the joint venture, but [2] other partners to the joint venture may participate in all [A] corporate governance [B] activities and [C] decisions of the joint venture [D] as is commercially customary[.]

13 C.F.R. § 125.18(b)(2)(ii)(A).[36]

No party in this case contends that any of the above-quoted operational words or phrases from 13 C.F.R. § 125.18(b)(2)(ii)(A) constitute regulatory terms of art defined somewhere in 13 C.F.R. (or elsewhere).  Rather, DIS contends that the veto power over litigation and settlement that SAS's non-managing partner may exercise violates the plain meaning of clause [1] of 13 C.F.R. § 125.18(b)(2)(ii)(A).  For the reasons explained below, however, the Court finds that, to the extent the regulation at issue has any plain meaning at all, it favors the government.

In the alternative — assuming for the sake of argument that there is no plain meaning of 13 C.F.R. § 125.18(b)(2)(ii)(A) that favors the government — this regulation

---

to the statute and regulation still may receive *Skidmore* deference" even where *Auer* deference is unwarranted).

[36] The Court has annotated the regulation to divide between clause [1] — which applies to the managing venture — and clause [2], which applies to the non-managing venturer (*i.e.*, the non-SDVOSB in a joint venture under the MPP).  The Court has further denominated the various operational words and phrases within each clause, as these terms contribute to any putative ambiguities in the regulation.

may be fairly characterized as "hopelessly ambiguous," *Animal Legal Def. Fund*, 223 F. Supp. 3d at 1022–23.  In that regard, the following questions illustrate the interpretive challenge:

1. In clause [1], does "day-to-day" modify both "management" and "administration," and does it matter?

2. In clause [1], what do the terms "management" and "administration" mean and how do they differ from each other, if at all?

3. Putting aside the precise definition of "management" or "administration," is the managing venturer's power in clause [1] limited to questions involving "the contractual performance of the joint venture"?  In other words, does the latter phrase serve to limit the scope of both "management" and "administration" or only "administration"?

4. In clause [2], what does the phrase "participate in" mean?

5. In clause [2], does the phrase "corporate governance" modify "activities" and "decisions" such that there are two categories: "corporate governance activities" and "corporate governance decisions"?  Or should the phrase be read as creating these two categories: "corporate governance activities" and other general business "decisions"?

   a. Is there a practical distinction between those various readings?

   b. What does the modifier "corporate governance" include?

6. In clause [2], does the phrase "as is commercially customary" function as a limitation or is the phrase simply a truism?[37]

   a. If the phrase "as is commercially customary" serves as a limitation, does it apply to both "activities" and "decisions" or only the latter?

   b. If the phrase "as is commercially customary" is a truism, does that mean that any subject not within clause [1] (*i.e*, the control of the

---

[37] If the phrase "as is commercially customary" is just a truism, that would mean it does not limit the scope of the other partners' participation in any particular decision.  Rather, the phrase just makes clear that, unless the control is reserved to the managing venturer pursuant to clause [1], general business decisions may be shared "as is commercially customary."  This is the position SBA OHA adopted: "This regulation thus contemplates that while the SDVO SBC member of a joint venture controls contract administration and performance, *the other member takes part in general business decisions of the joint venture, as is customary for participants in a joint venture to do*." AR 5437 (*Strategic All. Sols.*, 2023 WL 580566, at *14) (emphasis added).  Plaintiff does not offer any argument about how decisions to begin or settle litigation align with commercial customs. Accordingly, DIS has waived any argument on that subject and the Court does not need to explore the contours of what is "commercially customary" to resolve DIS's complaint or the parties' MJARs.

managing venturer) necessarily falls within clause [2] (*i.e.*, decisions in which "other partners may participate")?   Put differently, are there buckets of activities and decisions that the regulation does not address because they are not covered by either clause?[38]

The parties themselves agree that at least some of these questions cannot be answered with any degree of certainty.  This Court therefore holds, in the alternative, that either *Auer* or *Skidmore* deference may be applied to OHA's January 12, 2023, decision at issue, AR 5423–38 (*Strategic All. Sols.*, 2023 WL 580566).

### B.   The Plain Meaning of 13 C.F.R. § 125.18(b)(2)(ii)(A)

#### 1.   The Scope of the First Clause of 13 C.F.R. § 125.18(b)(2)(ii)(A) is Narrower than What DIS's Argument Requires

Assuming for the sake of argument that DIS is correct that this case may be resolved via a "plain language" analysis of 13 C.F.R. § 125.18(b)(2)(ii)(A), *see* Pl. MJAR at 15, this Court rejects DIS's reading.   According to DIS, "[c]laims and litigation are common tasks *related to* contract performance and, thus, one over which the managing venturer must retain complete control."   *Id.* (emphasis added).   DIS errs in its interpolation of "related to" — a phrase that would have expanded the reach of the regulation's clause [1] had SBA employed that phrase.  But "related to" simply is not there.

The missing phrase isn't innocuous.   The Federal Circuit repeatedly has emphasized the breadth of the phrase "related to" or "relating to."  In *Tyco Healthcare Group LP v. Ethicon Endo–Surgery*, for example, the Federal Circuit recognized that "[i]n general, 'related to' means one thing has some . . . connection to another thing," and "[i]n legal parlance," the term has "similar breadth."  587 F.3d 1375, 1378 (Fed. Cir. 2009).  The Federal Circuit "therefore interpreted the contractual phrase 'related to pending litigation' broadly."  *Todd Const., L.P. v. United States*, 656 F.3d 1306, 1312 (Fed. Cir. 2011) (quoting *Tyco Healthcare*, 587 F.3d at 1379,  concluding that "the 'relating to' language of the FAR [2.101] regulation itself is a term of substantial breadth," and cataloging supporting Supreme Court decisions).

Accordingly, if SBA intended to provide the managing venturer with the breadth of control (*e.g.*, over the decision to file a claim or initiate litigation) that DIS reads into

---

[38] SBA appears to have answered this question in the affirmative: "It is in this field of the overseeing and controlling the joint venture's performance of the contracts secured for the concern that the managing venturer must have control.  *Litigation regarding the contracts is not part of the day-to-day management of contract performance*."  AR 5437–38 (*Strategic All. Sols.*, 2023 WL 580566, at *15) (emphasis added).   As discussed *infra*, counsel for DIS concedes that the regulation's text does not clearly answer this question.

the regulation, SBA could have written a regulation employing the phrase "related to." Where SBA seeks to capture such breadth in words, the agency has, indeed, used that very phrase. *See, e.g.*, 13 C.F.R. § 128.308(b) (effective January 1, 2023) ("SBA may review any information *related to* the concern's eligibility including, but not limited to, documentation *related to* the firm's legal structure, ownership, and control." (emphasis added)).[39]  Indeed, even within the very regulation at issue, SBA twice employs the "relating to" phrase to indicate a requirement's broad scope.  *See id.* §§ 125.18(b)(2)(ix), 125.18(b)(7); *see also id.* §§ 125.8(b)(2)(ix), 125.8(g).   The fact that 13 C.F.R. § 125.18(b)(2)(ii)(A) does *not* employ the phrase "related to" means the Court should not read it in, contrary to DIS's gloss, *see* Pl. MJAR at 15.

While DIS's interpretive focus on "contract performance" is correct, *see* Pl. MJAR at 13–15, the question is not whether decisions regarding claims, litigation, and settlement somehow generally "relate to" contract performance, but rather whether such decisions are part-and-parcel of "*day-to-day* management and administration *of the contractual performance* of the joint venture."   13 C.F.R. § 125.18(b)(2)(ii)(A) (emphasis added).  No matter how that regulatory phrase is sliced, however, this Court cannot read it as covering decisions about claims and litigation.  "Contract performance" means meeting the contract's statement of work, in compliance with the contract's terms and conditions.[40]  Albeit in a different context, the Federal Circuit, in *Kellogg Brown & Root Services, Inc. v. United States*, 728 F.3d 1348 (Fed. Cir. 2013), addressed this very distinction between contract performance and the decision to file a claim.  In that case, the Federal Circuit rejected the government's argument that the Forfeiture of Fraudulent Claims statute, 28 U.S.C. § 2514, applies to contract performance; in so doing, the Federal Circuit expressly contrasted "contract performance" or "the execution of a contract" with the "submission of a claim."  *Id.* at 1365–66 & nn.18–19 (citing cases); *see also Oasis Int'l Waters v. United States*, 134 Fed. Cl. 405, 409, 427–28 (2016) (applying *Kellogg Brown & Root* in a case where plaintiff's allegedly fraudulent certified CDA claim was filed "[a]fter the end of contract performance").

Because a government contractor does not engage in contract performance when it files a claim with a CO, or opposes the United States in litigation, 13 C.F.R.

---

[39] *See also, e.g.*, 13 C.F.R. § 125.5(*l*)(ii) (effective November 16, 2020); *id.* §§ 121.103(b)(2)(ii)(A), (g) (effective January 5, 2022, through December 31, 2022); *id.* § 121.410 (referring to "subcontracts which relate to Government procurements").  Permitting non-SDVOSB mentors to meaningfully participate in claim and litigation decisions of the joint venture is consistent with 13 C.F.R. § 125.9(a), which encourages mentors to provide assistance to protégés "relating to" contract performance.

[40] *Shockley Constr. Co.*, B-200125, 80-2 CPD ¶ 352, 1980 WL 14656, *2 (Comp. Gen. Nov. 10, 1980) ("Since a contractor is required to comply with all terms and conditions of a contract . . . as well as the actual work specifications, such compliance with any contractual term, condition or specification is in our opinion contract performance.").

§ 125.18(b)(2)(ii)(A) does not require the managing venturer to have plenary authority over claims, litigation, or settlement.[41]  Counsel for DIS essentially agreed with that assessment.  During oral argument, the Court asked counsel for DIS: "What's the answer to Intervenor's argument . . . that litigation" does not qualify as "the day-to-day management [and] administration of contractual performance"?  Tr. 103:16–20.  The Court further observed, in support of its question, that "[t]here's no section in a [government contract's] performance work statement that says [']please sue us . . . . [']" Tr. 103:25–104:1.  Counsel for DIS responded: "I agree with that, Your Honor."  Tr. 104:2.  To parry that interpretational attack, DIS counters that JVOA Section 5.4.6 "is not only limited to litigation under the contracts" but "also talks about raising *claims* under the contract."  Tr. 104:4–5 (emphasis added).  According to DIS, because the FAR's definition of "claim," Tr. 104:7, includes "relief arising under or relating to the contract," FAR 2.101, the decision about whether to file a claim inherently relates to contractual performance.  But that argument runs headlong into the fact that, as the Court explained *supra*, the decision to file, litigate, or settle a claim does not constitute a contractor's performance.  Moreover, while SBA's wording of the regulation does *not* include broadening language (such as "related to"), the regulation does include limiting language, such as "day-to-day" (as opposed to "all").

To recap, the decision to submit a CDA claim to a contacting officer is *not* part of the "day-to-day management and administration of the contractual performance of the joint venture," 13 C.F.R. § 125.18(b)(2)(A), even though such a claim must seek "relief arising under or *relating to* the contract," FAR 2.101.  Although DIS may view this distinction — between decisions about whether to submit a claim and the nature of claims themselves — as "splitting hairs," the Court views it as reading with precision.  *United States v. Alo-Kaonohi*, -- F. Supp. 3d --, 2022 WL 10082094, at *4 (D. Haw. Oct. 17, 2022) ("Although this may seem like splitting hairs, it is what the law requires[.]").

Finally, the Court notes once again that DIS does not challenge JVOA Section 5.4.6's inclusion of a mutual approval power regarding settlement decisions.  Perhaps that is because OHA's prior cases appear to exempt consent judgments, *S. Contracting Sols. III*, 2018 WL 4492382 at *12 ("The submission of a claim to arbitration . . . and confession of a judgment . . . puts [the mentor venturer] at risk of having to pay a potentially large claim.").  There seems no principled distinction between a consent judgment and an ordinary settlement — at least not in terms of either the text of 13 C.F.R. § 125.18(b)(2)(ii)(A) or its policy concerns (*i.e.*, why it would be permissible for the non-

---

[41] This Court recognizes, of course, that the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-09, and the FAR's disputes clause, FAR 52.233-1, govern claims and litigation procedures when suing the government (on a CDA-covered contract).  But that does not require this Court to equate the *decision* to file a claim — or to sue, or to settle a suit — with "contractual performance" and certainly not "*day-to-day* management and administration of the contractual performance."  13 C.F.R. § 125.18(b)(2)(ii)(A) (emphasis added).

managing venturer to be able to veto one but not the other).  Another fatal problem for DIS, in that regard, is that DIS proffers no textual or policy rationale for distinguishing between the decision to file a claim, the decision to initiate litigation, and the decision to settle a claim.  *See* AR 925 (JVOA § 5.4.6, listing these decisions).  This Court cannot discern any reason to distinguish between these three categories of decisions.  SBA quite obviously does not see a difference, AR 5436–37 (*Strategic All. Sols.*, 2023 WL 580566, at *14–15), and this Court has no tangible reason to disagree with the SBA, particularly given that DIS fails to even posit a distinction.

### 2.  The Scope of the Second Clause of 13 C.F.R. § 125.18(b)(2)(ii)(A) Is Broad Enough to Permit JVOA Section 5.4.6

In addition to reading the phrase "related to" into clause [1] of 13 C.F.R. § 125.18(b)(2)(ii)(A), DIS challenges SBA OHA's revised view of that regulation, *see* AR 5423–38 (*Strategic All. Sols.*, 2023 WL 580566), as misinterpreting clause [2]'s use of the word "participate."  Pl. MJAR at 22.  According to DIS, a non-managing venturer "can have a say in [clause [2]] activities but, at the end of the day, the managing venturer must have the final word over them."  Pl. Resp. at 4–7 ("[T]he extent to which [non-managing venturers] can participate . . . doesn't reach the level of control[.]"); *see also* Pl. MJAR at 20–22 ("But *controlling* a decision is different from *having a say* in it."); Tr. 52:21–25, 53:1–13 (DIS arguing that veto power akin to SAS's JVOA Section 5.4.6 "goes too far for 'may participate'" regulatory language).[42]

---

[42] DIS's paraphrasing of the regulation is inaccurate.  The regulation gives the managing venturer control over "day-to-day management and administration of the contractual performance *of the joint venture*," 13 C.F.R. § 125.18(b)(2)(ii)(A) (emphasis added), ***not*** "day-to-day management *of the joint venture* or administration of *its* contractual performance," Pl. MJAR at 22 (emphasis added).  DIS's reading would require this Court to break the one prepositional phrase "of the contractual performance of the joint venture" into two phrases, applying half only to "administration" and the other half to both "management" and "administration of the contractual performance."  DIS's reading is not the natural one.  It also contradicts other SBA regulations that show a managing venturer need not manage certain critical contract and compliance tasks like facility security.  *See* 13 C.F.R. § 121.103(h) (discussing joint venture employees for "administrative functions" and any partner's performance of a contract's "ancillary" portions).  DIS's view would also break from the contract performance focus of 13 C.F.R. § 125.18(b)(2)(ii).  *See* 85 Fed. Reg. at 66,167 (stressing SBA's goal of linking "the individual responsible *for performance*" and "the small business managing venture" (emphasis added)); 13 C.F.R. § 125.18(b)(2)(ii) (requiring SDVOSB joint venture agreements to designate a managing venturer and a "manager with ultimate responsibility *for performance of the contract*" (emphasis added)).  Furthermore, if the managing venturer controlled all management of the joint venture, then the OHA precedents DIS favors, *see* Pl. MJAR at 21–22, are themselves flawed insofar as they identified so-called "extraordinary" actions for which unanimous consent among partners is permitted, *see* AR 5437 (*Strategic All. Sols.*, 2023 WL 580566, at *14).

DIS, however, implicitly and improperly defines "participate" in a manner that not only conflates participation and control, but also, in the process, renders the entire clause meaningless. If "participate" is limited to a partner's ability to express a viewpoint, as DIS's argument suggests, then clause [2] teaches nothing. There was never any regulatory provision precluding a non-managing partner from communicating its concerns about, or its opposition to, a managing venturer's decision to file a claim, engage in litigation, or settle a suit. In other words, if DIS is correct, and the word "participate" merely permits a non-managing partner to register a disagreement with the managing venturer, the word "participate" — and, thus, clause [2] of § 125.18(b)(2)(ii)(A) — yields the non-managing partner no authority whatsoever. Because "a statute or regulation 'should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant,'" *Baude v. United States*, 955 F.3d 1290, 1305 (Fed. Cir. 2020) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)), this Court rejects DIS's interpretation of "participate."

To give the proper scope to the word "participate," it must include something more than the ability to voice a concern but less than plenary power (*i.e.*, "control").[43] Interpreting "participate" as permitting the non-managing partner a right to veto decisions in the scope of clause [2] is consistent with the plain meaning of the word "participate" in this context. Indeed, that interpretation strikes this Court as making the most sense, particularly given how activities and decisions in clause [2]'s scope (*e.g.*, including corporate governance activities) can have substantial implications for the joint venture partners well beyond contract performance.

The Court's understanding of "participate" also gives meaning to the coordinating conjunction "but" that separates the two clauses of 13 C.F.R. § 125.18(b)(2)(ii)(A). The word "but" implies a contrast or exception that simply would not exist under DIS's reading. *See, e.g.*, *Witherspoon v. Stonebreaker*, 30 F.4th 381, 394 (4th Cir. 2022) (agreeing that "the word 'but,' means, 'on the contrary' or shows contrast or [is] used to negate which means, to make ineffective" (alteration in original)).[44] The Court's reading,

---

[43] A reading of the regulation that equates "participate" and "control" would also run afoul of the interpretive presumption that different words convey different meanings. *See, e.g.*, *Ysleta Del Sur Pueblo v. Texas*, -- U.S. --, 142 S. Ct. 1929, 1938–39 (2022) (rejecting "an interpretation that violates our usual rule against 'ascribing to one word a meaning so broad' that it assumes the same meaning as another statutory term" because such a view "defies our usual presumption that 'differences in language like this convey differences in meaning'" (citation omitted) (first quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995); and then quoting *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017))).

[44] *Vonlinger v. Berryhill*, 2017 WL 2568931, at *7 (E.D. Ky. June 13, 2017) ("The word 'but' also creates ambiguity because it is a conjunction that indicates contrast with an earlier statement." (citing *But*, Merriam-Webster, https://www.merriam-webster.com/dictionary/but (last visited Mar. 22, 2023)); *Newport News Shipbuilding & Dry Dock Co. v. United States*, 34 F.2d 100, 106 (4th

however, builds in a natural contrast between "control" and "participate":  a managing venturer has unilateral *control* over "day-to-day management and administration of the contractual performance of the joint venture," but other partners may *participate in* (*e.g.*, exercise non-unilateral powers over) certain general business decisions that do not constitute "contractual performance."  13 C.F.R. § 125.18(b)(2)(ii)(A).

Contrasting "control" and "participation" in that manner is at least somewhat supported by case law in other contexts.  *Compare Reves v. Ernst & Young*, 57 U.S. 170, 179 (1993) ("In order to 'participate, directly or indirectly, in the conduct of [an] enterprise's affairs,' one must have *some part in directing* those affairs." (emphasis added)), *with Delta Talent, LLC v. Wolf*, 448 F. Supp. 3d 644, 652 (W.D. Tex. 2020) ("*[C]ontrol* means the direct or indirect *legal right and authority to direct* the establishment, management, and operations of an entity." (emphasis added)), *and Hovind v. Comm'r*, 104 T.C.M. (CCH) 400, 2012 WL 4662961, at \*12 (T.C. 2012) ("A taxpayer has dominion *and control* when the taxpayer is free to use . . . funds *at will*." (emphasis added) (citing *Rutkin v. United States*, 343 U.S. 130, 137 (1952)).  The Court's (and SBA OHA's) interpretation of "participate" — which permits non-managing venturers to have approval power over certain decisions — does *not* give non-managing venturer(s) "control" over the decisions JVOA Section 5.4.6 covers.  Moreover, the Court's interpretation has an advantage over DIS's reading: the former gives "participate" some meaning by contrasting it with "control."  JVOA Section 5.4.6 merely gives the non-managing venturer some material part in — but not control over — the covered decisions, consistent with the word "participate" in § 125.18(b)(2)(ii)(A).  *Cf. Reves*, 507 U.S. at 178–79 (contrasting the verb "conduct" — which "require[s] some degree of direction" — and "participate," which requires "*some part in* that direction" (emphasis added)).

This Court's reading of clause [2] of 13 C.F.R. § 125.18(b)(2)(ii)(A) is further supported by the SBA's treatment of the facility security clearance function, a functional area in which the regulations even permit non-managing partners to have responsibility for managing or administering some day-to-day contractual performance.  As described *supra*, a non-SDVOSB partner to a joint venture may have sole responsibility to perform "ancillary" portions of a contract if such work requires facility security clearance. 13 C.F.R. § 121.103(h)(4)(ii) (effective January 5, 2022, with no subsequent relevant revision). In other words, even where a non-SDVOSB partner is solely responsible for security requirements, the SBA does not view such control as problematic for the joint venture's size (and therefore its SDVOSB status), notwithstanding that a facility clearance and related personnel may be critical prerequisites for both a contract award and compliance. *Id.* § 121.103(h)(4) ("A joint venture may be awarded a contract requiring a facility security clearance where either the joint venture itself or the individual partner(s) to the joint venture that will perform the necessary security work has (have) a facility security

---

Cir. 1929) ("The use of the word 'but' further down, would seem to contrast the two obligations[.]").

clearance."). The SBA OHA's position regarding SAS's JVOA Section 5.4.6 — providing BCF with veto power over claims, litigation, and settlements — is perfectly consistent with the regulatory provisions permitting a non-SDVOSB entity to exercise control over facility security decisions, *id.*, which may even involve some level of day-to-day management of contract performance.

In sum, claim and litigation decisions sensibly fit within the scope of clause [2]'s activities and decisions, such that an SDVOSB joint venture agreement may provide that a non-managing partner must approve (or may veto) claim and litigation decisions. As SBA OHA correctly observed, the decision to initiate or settle disputes can have far-reaching ramifications for the joint venture's partners. *See* AR 5437 (*Strategic All. Sols.*, 2023 WL 580566, at *15) ("Litigation on behalf of the joint venture can have results which might impair the interests of the venturers, and thus it is not inappropriate that BCF have the right to approve contract litigation."). Indeed, such ramifications can extend far beyond contract performance (*e.g.*, document and deposition discovery, risk of fraud counterclaims).[45] SBA OHA's decision in that regard makes all the more sense given cases noting "the force of the rule that demands the joinder of all co-venturers in the pursuit of a common claim" where the joint venture is not a distinct corporate entity. *Pine Prods. Corp. v. United States*, 15 Cl. Ct. 11, 14 (1988).[46] DIS has failed to show that decisions to file claims or pursue litigation are beyond "all corporate governance activities and decisions of the joint venture as is commercially customary." 13 C.F.R. § 125.18(b)(2)(ii)(A). Instead, the Court views claim and litigation decisions as properly within the clause [2] bucket of actions where the regulation permits non-managing partner participation.

### C. In the Alternative, SBA OHA's Interpretation of 13 C.F.R. § 125.18(b)(2)(ii)(A) is Entitled to Deference

Assuming 13 C.F.R. § 125.18(b)(2)(ii)(A) does not unambiguously support the government's position, that does not lead to the ineluctable conclusion that DIS's reading is more plausible than the government's, let alone that DIS's reading is correct. To the contrary, if the plain meaning of 13 C.F.R. § 125.18(b)(2)(ii)(A) does not favor the

---

[45] *Pine Prods. Corp. v. United States*, 945 F.2d 1555, 1560–61 (Fed. Cir. 1991) ("[G]eneral principles of partnership law are applicable to joint ventures, and under general partnership law, a partner is jointly and severally liable for obligations and debts of the partnership." (citing cases and secondary sources)); *Johnson Lasky Kindelin Architects, Inc. v. United States*, 151 Fed. Cl. 642, 653–54 (2020) (joint and several liability can apply to contract claims in narrow circumstances).

[46] *See also Magnum Opus Techns., Inc. v. United States*, 94 Fed. Cl. 512, 529 (2010) (applying *Pine Products*, 15 Cl. Ct. at 14); *Universal Coatings/WON Ill Co., Ltd. v. United States*, 24 Cl. Ct. 241, 245 (1991) (explaining that "[i]n the absence of a special agreement, a co-venturer does not have the authority to bind other co-venturers" and thus cannot submit a certified CDA claim on behalf of the joint venture).

government, then, at best, the regulation is ambiguous.  If 13 C.F.R. § 125.18(b)(2)(ii)(A) is ambiguous, SBA OHA's decision, AR 5423–38 (*Strategic All. Sols.*, 2023 WL 580566), is entitled to deference.

### 1.  DIS Concedes 13 C.F.R. § 125.18(b)(2)(ii)(A) Is Ambiguous

For starters, DIS's counsel of record acknowledged at least twice during oral argument that 13 C.F.R. § 125.18(b)(2)(ii)(A) is ambiguous.  In a discussion about the relative scope of the regulation's two clauses, the Court, in essence, asked whether (a) locating a type of decision outside of one clause's scope necessarily located that type of decision inside the other clause's scope, or (b) the regulation assumes that there are decisional categories beyond either clause that the regulation's text does not expressly capture.  Tr. 54:3–8 ("Is it possible that there's a third category . . . yet other categories of work that aren't even discussed [in 13 C.F.R. § 125.18(b)(2)(ii)(A)]?").  Counsel for DIS responded in the affirmative, acknowledging that such a reading is "certainly possible."  Tr. 54:9–10.  That, in turn, prompted the Court to observe that the regulation is "[k]ind of ambiguous, you might say."  Tr. 54:11.  Counsel for DIS concurred: "Yes, correct.  I was just going to say the regulation isn't too clear on that point" such that "there could, in theory, be items that may fall into yet a third bucket that's not discussed here."  Tr. 54:12–16, 19 (commenting that the regulation has "[p]enumbras, if you will").  Later during oral argument, counsel for DIS further volunteered that "if this regulation is ambiguous, which I think *everybody here has agreed that [it] certainly i[s] — it's certainly not clear*."  Tr. 102:25 to 103:1–2 (emphasis added).  These concessions bind DIS.[47]

Particularly given the interpretative questions the Court posed *supra* regarding 13 C.F.R. § 125.18(b)(2)(ii)(A) — almost none of which the parties addressed with any degree of precision — the Court is convinced that if SBA OHA's interpretation of that regulation

---

[47] *See ModernaTx, Inc. v. Arbutus Biopharma Corp.*, 18 F.4th 1352, 1361 (Fed. Cir. 2021) (quoting a concession by counsel at oral argument as evidence a plaintiff fell short of its burden); *Faiella v. Fed. Nat'l Mortg. Ass'n*, 928 F.3d 141, 146 (1st Cir. 2019) ("A party ordinarily is bound by his representations to a court and — having staked out his position in response to the district court's inquiry — the appellant cannot now repudiate that position." (citation omitted)); *United States v. Lloyd*, 10 F.3d 1197, 1208–09 (6th Cir. 1993) (concession made by defendant's attorney in district court was binding on appeal); *Adidas Sportschuhfabriken ADI Dassler KG v. Chen*, 1988 WL 1091940, at *7 (N.D. Cal. Feb. 2, 1988) (concluding that a court "is entitled to rely upon and enforce the representations of counsel" because "the Court system would soon fail to function were the Court not able to rely upon representations and stipulations of counsel acting on behalf of their clients").  The other parties similarly acknowledged ambiguities in 13 C.F.R. § 125.18(b)(2)(ii)(A).  *See* Tr. 115:20–25 (government counsel referring to the possible existence of actions beyond the scope of 13 C.F.R. § 125.18(b)(2)(ii)(A) as in "the realm of potential ambiguities"); Tr. 97:3–15 (SAS's similar view).

is not supported by its plain language, then SBA OHA's interpretation is entitled to *Auer* deference. That is because SBA OHA's interpretation of 13 C.F.R. § 125.18(b)(2)(ii)(A) is, at a minimum, reasonable — for all of the textual reasons the Court explained above. In addition, also as noted above, SBA OHA offered a sound policy rationale for its interpretation: "Litigation on behalf of the joint venture can have results which might impair the interests of the venturers, and thus it is not inappropriate that BCF have the right to approve contract litigation." AR 5437 (*Strategic All. Sols.*, 2023 WL 580566, at *15). This Court is not in a position to second-guess SBA OHA's conclusion regarding how best to assist small business or SDVOSBs in the context of SBA-managed programs.

### 2. Considerations that Can Preclude *Auer* Deference Do Not Apply to the SBA OHA Decision DIS Challenges in this Case

None of the considerations which might preclude *Auer* deference apply here.

*First*, SBA OHA decisions represent the SBA's official and authoritative position. *Alma Promotions, Inc.*, SBA No. 800 (Dec. 2, 1985) ("OHA's authority to hear and decide appeals is derived from 15 USC 634(b) (which enumerates the powers of the Administrator of SBA)[.]"); *see also* 15 U.S.C. §§ 634(b)(6), (i) (codifying OHA's jurisdiction and powers); *Mechanix Wear, LLC*, SBA No. SIZ-6108, 2021 (July 7, 2021) (explaining that "OHA decisions are initial [agency] decisions except for those specific categories of decisions which the regulation provides will be final agency decisions" and noting that "[i]nitial decisions or reconsidered initial decisions may be reviewed by the Administrator" (citing 13 C.F.R. §§ 134.227(a), 134.228(a))).

*Second*, although DIS characterizes the challenged SBA OHA decision as a departure from OHA's own precedent, *see* Pl. MJAR at 21–22, SBA OHA explained that the precedent DIS relies upon predated the 2020 amendment to 13 C.F.R. § 125.18(b)(2). AR 5436 (*Strategic All. Sols.*, 2023 WL 580566, at *14). Thus, OHA's decision at issue explains that "the additional language in the 2020 amendment means the analyses are inherently different." *Id.* (holding that SAS "offers an argument substantial enough for OHA to determine the additional language in 13 C.F.R. § 125.18(b)(2)(ii) warrants a different interpretation").[48]

*Third*, the government's position here is *not* a "'post hoc rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack." *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 209 (2011) (alteration in original) (quoting *Auer*, 519

---

[48] *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change."); *Mason v. Shinseki*, 743 F.3d 1370, 1375 (Fed. Cir. 2014) ("What matters is that an agency's 'interpretation of its own regulation reflects its considered views' and is not 'merely a post hoc rationalization of past agency action.'" (quoting *Long Island Care*, 551 U.S. at 171)).

U.S. at 462).  To the contrary, SBA OHA revisited its prior ruling in this case due to this Court's remand order — the terms of which all parties consented to.  *See Strategic All. Sols.*, 2022 WL 17097233, at *2 (explaining that "the government filed a consent motion for a voluntary remand," that "the government proposes remanding this case to OHA to reconsider the challenged OHA decision[,]" and "commend[ing] the parties on their work to reach what appears to be a sensible agreement that conserves judicial resources"). Thus, the point of the new decision was not "to defend past agency action against attack," *Chase Bank USA*, 562 U.S. at 209 (quoting *Auer*, 519 U.S. at 462), but rather to decide the meaning of  13 C.F.R. § 125.18(b)(2)(ii)(A) as applied to JVOA Section 5.4.6.

Indeed, this point answers yet another argument DIS advances (as part of Count III): that SBA OHA's regulations effectively precluded OHA's revisiting its prior decision. Pl. MJAR at 22 (arguing that OHA's "reversal in January [2023] did not meet the standard to grant reconsideration"); Compl. ¶ 50.  But having consented to the remand to do just that, *see Strategic All. Sols.*, 2022 WL 17097233, at *2 (consent order for OHA to "reconsider its September 22, 2022, decision and issue a new decision"), DIS waived its argument, as this Court recently held in a different case.  *See Vanquish Worldwide, LLC v. United States*, 163 Fed. Cl. 57, 72 (2022)  ("In the absence of a time machine, [Plaintiff] is out of luck; [Plaintiff] is bound by its [remand] agreement with the government and [Intervenor].").

What this Court wrote in *Vanquish* applies with equal force here:

> Permitting [Plaintiff] to unravel its previous agreement with the parties (which resolved [Intervenor]'s protest) would be remarkably prejudicial to both the government and [Intervenor] for obvious reasons.  Not the least of these reasons are (1) the passage of time and the government's need to complete this procurement, (2) the government's and the other offerors' investments in the [remand proceedings] . . . , and (3) the fact that accepting [Plaintiff]'s position here would mean all the parties are back to square one regarding [Intervenor]'s [original] protest action that the parties previously resolved (with the Court's approval).

*Vanquish Worldwide*, 163 Fed. Cl. at 73.[49]

---

[49] This also disposes of any claim by DIS of unfair surprise or that DIS was somehow entitled to rely on a settled expectation of SBA OHA's position.  Moreover, even without the procedural history leading up to the January 12, 2023, SBA OHA decision, the Court would find it difficult to comprehend any claim by DIS of unfair surprise given that OHA's decision on remand merely permitted SAS's JVOA.  The story may have been different if OHA had determined, based on some new interpretation, that DIS had some size or status defect that DIS did not anticipate.  But that is not what happened here.

*Fourth*, DIS does not contend that SBA OHA's interpretation of 13 C.F.R. § 125.18(b)(2)(ii)(A) is somehow outside of OHA's competency or expertise, and for good reason: such an argument would be silly.    The interpretation of 13 C.F.R. § 125.18(b)(2)(ii)(A) — within the function, purpose, and meaning of the SDVOSB set-aside regulations as a whole — is squarely within SBA's expertise.  As explained above, the Court reads 13 C.F.R. § 125.18(b)(2)(ii)(A) as permitting the non-managing partner to approve claims, litigation, and settlement decisions.  Still, the Court acknowledges the obvious fact that the regulation does not literally spell out an answer to the precise question at issue in this case regarding Section 5.4.6 of SAS's JVOA.  Given the questions the Court posed during oral argument about the meanings of the different regulatory phrases at issue, it is hardly surprising the parties ultimately agreed that the regulation is ambiguous.  That being the case, "broad deference is all the more warranted when, as here, the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991), and applying other Supreme Court cases descended from *Seminole Rock* to parse Medicare reimbursement regulations); *Kisor*, 139 S. Ct. at 2417 ("'Congress intended to invest interpretive power' in whichever actor was 'best position[ed] to develop' expertise about the given problem." (quoting *Martin*, 499 U.S. at 151)).

### 3.  DIS's Remaining Arguments Against the SBA OHA Decision Fall Short

DIS further argues that this Court should reject SBA OHA's interpretation of 13 C.F.R. § 125.18(b)(2)(ii)(A) for two additional reasons.  First, according to DIS, the Court should reject SBA OHA's view because, "[i]f allowed to stand, OHA's interpretation would mean that SBA's 2020 amendment substantively revised § 125.18(b)(2)(ii)(A) without complying with proper [notice and comment] rulemaking under the [APA]."  *See* Pl. MJAR 17–18; *see also* Compl. ¶ 4 (asserting that "a court of competent jurisdiction may hear a matter arising under the [APA]"); *id.* ¶¶ 32–45 (Count II) (asserting that SBA "[v]iolated the [APA]").  Second, DIS contends "the managing venturer must retain [complete] control of a joint venture's corporate governance" — *i.e.*, even if other partners "participate" — which is something DIS asserts the new OHA decision precludes.  Pl. MJAR at 19.  Both arguments fail.

With respect to the argument regarding an alleged APA violation, contained in Count II of DIS's complaint, the government moved to dismiss it for lack of jurisdiction, *see* Def. MJAR at 13–15.  According to the government, "whether the SBA violated the APA when it promulgated the October 2020 amendment is not an alleged violation of a statute in connection with a procurement" and, thus, not within this Court's 28 U.S.C. § 1491(b) jurisdiction.  *Id.* at 13–14.  The Court agrees with the government and so, apparently, does DIS, as it clarifies in its response brief that, "contrary to the

government's insinuation, DIS does *not* ask the Court to declare § 125.18(b)(2)(ii)(A) to be unlawful and enjoin its application." Pl. Resp. at 7 (emphasis added). Rather, as DIS explains, it simply "ask[s] the Court to interpret § 125.18(b)(2)(ii)(A) in a manner that complies with the [APA], to *avoid* a situation where SBA (even unwittingly) violated it," *id.* at 8 — a kind of APA twist on the canon of constitutional avoidance. *See Veterans4You LLC v. United States*, 985 F.3d 850, 860–61 (Fed. Cir. 2021) ("The canon of constitutional avoidance provides that '[w]hen a serious doubt is raised about the constitutionality of an act of Congress,' courts should 'first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'" (internal quotation marks omitted) (alteration in original) (quoting *Jennings v. Rodriguez*, -- U.S. --, 138 S. Ct. 830, 842 (2018))).

DIS thus posits that "an interpretation that presupposes an agency violating the [APA] doesn't pass a basic rationality test." Pl. Resp. at 8. But that argument turns *Auer* and *Skidmore* deference jurisprudence on its head. When this Court asks whether an agency's interpretation of an ambiguous regulation is reasonable, we ask only whether the interpretation "come[s] within the zone of ambiguity the court has identified after employing all its interpretive tools." *Kisor*, 139 S. Ct. at 2415–16 (holding that "[t]he text, structure, history, and so forth at least establish the outer bounds of permissible interpretation"). This Court's explanation of 13 C.F.R. § 125.18(b)(2)(ii)(A) demonstrates that SBA OHA's reading of the regulation is, at a minimum, within "the outer bounds of permissible interpretation." *Id.*; *see supra* Section V.B (applying the Court's interpretive tools).

To be clear, this Court agrees that it has the power to — indeed, must — disregard a regulation that is contrary to law (*e.g.*, the regulation is trumped by a statute or is otherwise not properly promulgated). But, again, DIS does not ask this Court to set aside SBA's 2020 revisions to 13 C.F.R. § 125.18(b)(2)(ii)(A) — and the government is correct that this Court lacks such power in any event. Nor, for that matter, does DIS contend that § 125.18(b)(2)(ii)(A) was improperly promulgated *per se*.[50] DIS instead effectively asks this Court to disregard § 125.18(b)(2)(ii)(A) *based on SBA OHA's later interpretation of it.* Pl. Resp. at 8 (arguing that "the regulation would simply be interpreted the same as it was prior to its 2020 clarifying amendment"). That is just another way of saying that this Court should interpret 13 C.F.R. § 125.18(b)(2) as though SBA had not updated it in 2020, ignoring the settled rule of statutory and regulatory construction that provisions must be

---

[50] Indeed, given SBA's substantial updates to "13 CFR Parts 121, 124, 125, 126, 127, and 134," 84 Fed. Reg. at 60,846 — including expressly proposed changes to non-managing venturers' ability to control clearance decisions and certain clearance-dependent contract performance, *see id.* at 60,848, 60,868 — the ABA PCLS's suggested regulatory changes that resulted in § 125.18(b)(2)(ii)(A) were a logical outgrowth of the proposed rule. *See* AR 5348–49 (ABA PCLS's suggested revision); *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1373–74 (Fed. Cir. 2017) (summarizing the "logical outgrowth doctrine").

construed, if at all possible, to give meaning and effect to every word or phrase. *See United States v. Nordic Village, Inc.*, 503 U.S. 30, 36 (1992) ("[A] statute must, if possible, be construed in such fashion that every word has some operative effect." (citing cases)); *Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1367 (Fed. Cir. 1998) ("We should construe [a] statute, if at all possible, to give effect and meaning to all the terms." (citing Supreme Court cases)); *Silverman v. Eastrich Multiple Inv. Fund, L.P.*, 51 F.3d 28, 31 (3d Cir. 1995) (noting the "basic tenet of statutory construction, equally applicable to regulatory construction, that a statute 'should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error'" (quoting 2A Norman J. Singer, *Sutherland, Statutes and Statutory Construction* § 46.06, at 119–20 (5th ed. 1992))); *General Elec. Co. v. United States*, 221 Ct. Cl. 771, 610 F.2d 730, 734 (Ct. Cl. 1979) ("In determining the meaning of . . . regulations, rules of interpretation applicable to statutes are appropriate tools of analysis.").

In sum, this Court rejects DIS's argument that a regulation's validity may remain in a suspended state of quantum uncertainty pending an agency's interpretation and application of the regulation. DIS cites no authority for that proposition, nor was this Court able to locate any. This Court sees no reason to ignore the plain meaning of 13 C.F.R. § 125.18(b)(2)(ii)(A) — or SBA OHA's reasonable interpretation of that regulation — based on the APA.

Accordingly, to the extent that DIS has not abandoned Count II of its complaint, this Court **GRANTS** the government's and SAS's motions to dismiss DIS's APA claim for lack of jurisdiction. To the extent DIS maintains only that SBA OHA's interpretation of § 125.18(b)(2)(ii)(A) is irrational based on the APA's notice and comment requirements, the Court rejects that argument.

As for DIS's remaining argument that SBA OHA's interpretation of 13 C.F.R. § 125.18(b)(2)(ii)(A) improperly hamstrings the managing venturer's "control of a joint venture's corporate governance," DIS's interpretation is contrary to the regulation's plain language that non-managing partners may "participate in" such decisions. As explained above, the regulation must be read to give the non-managing venturer more than permission to express a viewpoint, but DIS improperly reads the regulation as providing the non-managing partner with only "a say in" claims, litigation, and settlement. Pl. MJAR at 20 (emphasis omitted). Again, the key flaw in DIS's interpretation of "participate" is DIS's failure to locate any middle ground between control — a *complete* say "over" something, *see, e.g.*, Tr. 52:17–20 — and a mere say "in" something.[51]

---

[51] *See, e.g.*, Pl. MJAR at 20 (arguing that "*controlling* a decision is different from *having a say* in it" (emphasis in original)).

DIS attacks "OHA's belief that § 125.18(b)(2)(ii)(A) allows a non-managing venturer's *control* over a joint venture's corporate governance," Pl. MJAR at 20 (emphasis added), but that is a strawman; OHA's decision expresses no such a "belief." *Id.* OHA does *not* interpret the regulation's use of the word to "participate" to mean "control," but rather only to permit unanimous consent among venturers for certain covered decisions. *See* AR 5437 (*Strategic All. Sols.*, 2023 WL 580566, at *14–15) ("This regulation thus contemplates that . . . the other [non-managing] member takes part in general business decisions of the joint venture[.]"). This is hardly unreasonable, given that all of the other decisions in JVOA Section 5.4 besides Section 5.4.6 "are clearly the type of decision [for which] OHA [previously] has found . . . a joint venture agreement may require unanimous consent." *Id.*

To be clear, then, contrary to DIS's implied premise, the JVOA at issue does *not* give BCF the power to *control* decisions to file a claim, to litigate, or to settle litigation; such decisions must be made jointly with the managing venturer. In other words — and to see the flaw in DIS's interpretation — DIS effectively reads the regulation with the following unjustifiable gloss (indicated by italicized, underlined, and bolded text):

> The managing venturer is responsible for controlling the day-to-day management and administration of the contractual performance of the joint venture, but ***while*** other partners to the joint venture may participate in all corporate governance activities and decisions of the joint venture as is commercially customary, ***the managing venturer solely controls those activities and decisions, too.***

This is an unreasonable and unsupported interpretation of the regulation, which would require the Court to read in words that aren't there.

DIS attempts to support its reading of § 125.18(b)(2)(ii)(A) on the grounds that: (1) the ABA PCLS's suggested revision modified "participate" with the phrase "fully and equally"; and (2) SBA omitted that phrase in the final regulation. Pl. MJAR at 19–20. DIS concludes that "SBA's omission of this language can only mean one thing: even under the updated § 125.18(b)(2)(ii)(A), the managing venturer must retain control of a joint venture's corporate governance." *Id.* at 19. But there's another, more reasonable, explanation: "fully and equally" adds nothing to the word "participate" and therefore was deemed superfluous. Indeed, *that* is the more plausible interpretation of events because, as explained *supra*, the word "but" separating the two clauses in the regulation implies a contrast or exception that simply would evaporate with DIS's implicitly added verbiage. *Witherspoon*, 30 F.4th at 394 ("[T]he word 'but,' means, 'on the contrary' or shows contrast or [is] used to negate which means, to make ineffective" (alteration in original)).

There is another way to see that DIS's view of "control[]"collapses the two clauses of § 13 C.F.R. § 125.18(b)(2)(ii)(A) together.  DIS would agree that, even in the absence of the 2020 regulatory amendment or JVOA Section 5.4.6, the non-managing venturer may express a "say in" the "day-to-day management and administration" of contract performance, notwithstanding the regulation's requiring that "control[]" of such decisions rest with the managing venturer.[52]  DIS's interpretation of 13 C.F.R. § 125.18(b)(2)(ii)(A), thus, necessarily reads the word "but" out of the regulation. According to DIS, all parties to the joint venture would have the same level of input on both categories of decisions covered in the regulation ("management and administration" and "activities and decisions"):  the managing venturer would have *control* and the non-managing venturer(s) would be able to *participate*.  That reading would all but render the entire regulation a nullity, and this Court rejects it.

Finally, this Court concludes that SBA OHA's decision at issue is entitled, at a minimum, to *Skidmore* deference, particularly under the general APA standard of review. SBA OHA's interpretation of 13 C.F.R. § 125.18(b)(2)(ii)(A) fits squarely within the area where SBA has "a body of experience and informed judgment to which courts and litigants may properly resort for guidance."  *Skidmore*, 323 U.S. at 140*; Darton Innovative Techns.*, 153 Fed. Cl. at 451.  Given the persuasiveness and sound reasoning of the January 12, 2023, OHA decision — including its policy considerations — not to mention DIS's lack of any compelling argument against *Skidmore* or APA deference, this Court sees no reason to enjoin the agency's interpretation of § 125.18(b)(2)(ii)(A).  *See Skidmore*, 323 U.S. at 140.[53]

## VI.   CONCLUSION

For the above reasons, the Court **DENIES** Plaintiff's motion for judgment on the administrative record and **GRANTS** Defendant's and Defendant-Intervenor's respective motions for judgment on the administrative record.  Accordingly, the Clerk of the Court is directed to enter **JUDGMENT** for Defendant and Defendant-Intervenor, terminating this case.

**IT IS SO ORDERED**.

s/Matthew H. Solomson
Matthew H. Solomson
Judge

---

[52] The operative SBA regulation even requires the joint venture parties to "[s]pecify[] the responsibilities of the parties with regard to negotiation of the contract, source of labor, *and contract performance*."  13 C.F.R. § 125.18(b)(2)(vii) (emphasis added).

[53] *See also Green*, 823 F. App'x at 944 (citing *Gose,* 451 F.3d at 837, which explained courts defer to an agency's interpretations of its own regulations "because the agency, as the promulgator of the regulation, is particularly well suited to speak to its original intent in adopting the regulation")).